Mr. Justice HELSOH
 

 delivered the opinion of the court.
 

 This is a writ of error to the Supreme Court of the State of Hew York. The case was decided by the Court of Appeals of that State; but the record had been remitted, after the de«
 
 *367
 
 cisión, to the Supreme Court, from which the appeal had been taken.
 

 The suit in the Supreme Court was an action of trespass,
 
 quare clausum, fregit,
 
 brought by the intestate, John Blacksmith, against the defendants, Joseph Eellows and Robert Kendle, for entering, with force and arms, into the close of the plaintiff, commonly known as an Indian sawmill and yard, at the town of Pembroke, county of Genesee, and then and there haying expelled and dispossessed the said plaintiff.
 

 The defendants plead, 1st, not guilty; and 2d, that the said close, &c., was the soil and freehold of the defendant, Eellows, and that the defendant, Eellows, in his own right, and the defendant, Kendle, as his servant, and by his command, broke and entered the said close, &c., as they lawfully might, for the cause aforesaid. To this plea there was a replication, averring that the close, soil, and freehold, was not the close of the defendant, Eellows.
 

 On the trial, it was proved by the plaintiff that the close mentioned in the declaration is situate in the town of Pembroke, county of Genesee, upon a tract of land of twelve thousand eight hundred acres, commonly known as the Tonawanda reservation, and was, at the time of the entry complained of, an Indian improvement upon the same; that said improvement was made about twenty years before the treaty, by the plaintiff and seven' other Tonawanda Indians; that the plaintiff is a native Indian, belonging to the Tonawanda band of the Seneca Indians, who reside on that reservation, and are a part of the'' Seneca Ration, and has so been known for at least thirty-six years; that he has resided on this reservation from his birth, and was in the actual possession of the said improvement at the time of the entry complained of; that on the 13th July, 1846, the defendants entered into and took possession of the said close, and turned the plaintiff out, and in doing so committed the trespass. It was admitted, that a treaty had been made between the United States and the Six Rations of Indians on the 11th Rovember, 1794, by which certain lands in western Rew York, including this Tonawanda reservation, are declared “to be the property of. the Seneca Ration; and the'United States will never claim the same, nor disturb the Seneca Ration, nor any of,the Six Rations, or their Indian friends residing thereon, and united with them in the free use and enjoyment thereof; but it shall remain theirs until they choose to-sell the saíne to fhé people of the United States, wpo have the right to purchase.”
 

 The plaintiff then rested.
 

 The defendants gave in evidence certain documents and acta
 
 *368
 
 of the Legislatures of the States of New York and Massachusetts, showing that a dispute had arisen, at an early day, between the two States, in respect to the title to a large tract of land within the limits of New York, of which the'
 
 locus in' qub
 
 is a part. That in'1786, the dispute was amicably settled by a cession from Massachusetts to New York of the sovereignty and jurisdiction over the tract, and by a cession from New York to Massachusetts of the right of pre-emption to the soil from the Indians.
 

 The lands were then in the independent occupancy of the Seneca Nation, and owned by them, and-that Massachusetts acquired by the cession the exclusive right of purchasing their title whenever they became disposed to sell; . that this right had become duly vested in Thomas L. Ogden and Joseph Eellows, by proper conveyances from Massachusetts, which ■survived to the latter on the death of Ogden.
 

 A treaty was then given in evidence, between the United. States and the New York Indians, bearing date 15th January, 1838, and another between the United States and the Seneca Nation, bearing date the 20th May, 1842, under which the defendant claims that he had acquired the Indian title to the close in question, and by virtue of which it is admitted the defence to the action in this case rests.
 

 The treaty Of 1838 (7 U. S. Stat., 551) set apart a tract of country, situated west of the State of Missouri, as a permanent home for all the New York Indians, containing one million eight hundred and twenty-four acres of land, being, ’ as is expressed in the treaty, “three hundred and twenty acres for each soul of said Indians, as their numbers are at present computed.” The tract is particularly described and located. It was intended for the future home of nine tribes of Indians, .containing, according to the official estimate, a population of five thousand four hundred and eighty-five. The Seneca tribe, including among them their friends, the Onondagas and Cayugas, numbers-a population- of two thousand six hundred arid thirty-three.
 

 ' J3y the tenth section of this treaty, special provision was made concerning this tribe and their friends already mentioned. They were to have assigned to them the easterly part of the tract set apart to the New York Indians, and to extend so far as to include one half section of land for each soul. The tribe agrees to remove, from New York to .their new” home within, five years, and continue to reside there. The section then recites the purchase of the title of the Seneca Nation to certain-lands described in a deed of conveyance by Ogden and Eellows, assignees of the State of Massachusetts, for -the consideration
 
 *369
 
 of $202,000, and also that the Nation, has agreed that said money shall he paid to the United States, and that out of this sum $102,000 shall he paid to the owners of the improvements on the land so conveyed, the residue to he invested in stocks •by the Government, the income of which is to he paid annually to the Nation at their new homes. The improvements were to be appraised, and a distribution of the $102,000 made among the owners, and “to be paid by the United States*to the individuals who were entitled to the same, &c., on their relinquishing their respective possessions to Ogden and Fellows.”
 

 By the fifteenth section of the treaty, the United States agree that they will appropriate the sum of $400,000, to be applied from time to time, under the direction of the President of the United States, in such proportions as may be most for the interest of the Indians who were parties to the treaty, “to aid them in the removal to their homes, and in supporting, them the first year after théir removal; to encourage and assist them in education, and in being .taught to cultivate their lands; in the erection of mills, houses,” &c.
 

 A large tract of land in Wisconsin that had been set apart to certain Indians was relinquished to the Government.
 

 The deed of conveyance from the Seneca Nation to Ogden and Fellows, and referred to in the treaty, is annexed thereto. It conveys four reservations in western. New York: the Buffalo Creek reservation, containing 49,920 acres; the Cattaraugus, 21,680 acres; the Allegany, 30,469 acres; and the Toúawanda, 12,800 acres.
 

 Some difficulty occurred in carrying this treaty into execution, which it is not important to refer to. These difficulties raised by the Indians resulted in a modification of it by a second treaty entered into on 20th May, 1842, which, after refer-ing to the first, and to the deed of conveyance to Ogden and Fellows, and to the differences that had arisen between the parties, .provides in the first article that Ogden and Fellows,, in consideration of the release and agreements afterwards, mentioned, stipulate that the Seneca Nation' might continue' in the-occupation and enjoyment of two of the reservations, the-Cat-taraugus and the Allegany, the same as before the'deed, of conveyance. And in the second article, the Seneca Nation; in consideration of the foregoing and other stipulations, agree to release and confirm to Ogden and Fellows the two remaining reservations, the Buffalo Creek and the Tonawanda.
 

 The third article provides for reducing the amount of the purchase-money to be paid by Ogden and Fellows, so as to correspond with the relative-value of the two reservations released to the value of the four, as fixed in the treaty of 1838.
 

 
 *370
 
 The fourth article provides for the appraisal of the land and improvements in these two reservations, by appraisérs — one to be appointed by the Secretary of War, and the other by Ogden and Eellows — and to report their proceedings to the Secretary, and also to Ogden and Eellows.
 

 The fifth article provides that the possession of the two tracts confirmed to Ogdón and Fellows should be surrendered up as follows: the unimproved lands on the tracts within one month after the reports of the appraisers, and the improvements within two years, provided that the amount to be ascertained and awarded as the proportionate value of said improvements shall, on the surrender thereof) be paid to the President of the United States, to be distributed among the owners according to the determination of the appraisers; and provided, also, the consideration for the release and conveyance of the lands shall, at the time of the surrender thereof, be paid or secured to the satisfaction of the Secretary of "War, the income of which to be paid to the Seneca Indians annually.
 

 The seventh article provides that the modification in this treaty of 1842 shall be a substitute for that of 1838, wherein it differs from it, and to this extent shall be deemed to repeal it.
 

 It will be seen that the principal change under the second treaty consists in the release, by Ogden and Fellows, to the Indians, of two of the four reservations conveyed to them under the treaty of 1838, and the corresponding reduction of the price to be paid. Most. of. the other provisions of the treaty are untouched, and remained in force. The assignment by the Government of the large tract of country for the Hew York Indians west of the Missouri — the special tract therein assigned to this Seneca Ration — their agreement to remove to their •new homes, and the large appropriation to aid in their removal and in their support and encouragement after they had arrived — all these provisions remained unaffected by the second treaty.
 

 Heither treaty, made any provision as to the mode or manner in which the removal of the Indians or surrender of the reservations was to take place. The grantees have assumed that they were authorized to take forcible possession of the two reservations, or of the four, as the case would have been under the first treaty. The plaintiff in this case was expelled by force; and unless this mode of removal ean be sustained, the recovery against the defendants for the trespass was right, and must be affirmed.
 

 The removal of tribes and nations of ‘Indians from their ancient possessions to their new homes in the "West, under
 
 *371
 
 treaties made with them by the United States, have been, according to the usage and practice of the Government, by its authority and under its care and superintendence. And, indeed, it is difficult to see how any other mode of a forcible removal can be consistent with the peace of the country, or with the duty of the Government to these dependent people, who have been influenced by its counsel and authority to change their habitations.
 

 The negotiations with them as a quasi nation, possessing some of the attributes of an independent people, and to be dealt with accordingly, would seem to lead to the conclusion, unless otherwise expressly stipulated, that the treaty was to be carried into execution by the authority or power of the Government, which was a party to it; and more especially, when made with a tribe of Indians who are in a state of pupilage, and hold the relation to the Government as a ward to his guardian. It is difficult to believe that it could have been intended by the Government that these people were to be left, after they had parted with their title to their homes, to be expelled by the irregular force and violence of the individuals who had acquired it, or through the intervention of the courts of justice. As we have seen, the Seneca Ration upon the four reservations consisted of a population of some two thousand six hundred and thirty-three souls; and if we include the Tuscaroras, whose lands were also purchased under the same treaty, nearly three thousand. It is obvious' that any such litigation would be appalling.
 

 If we look into- the provisions of the two treaties, we think the conclusion as clear, from a consideration of them, that no such means or manner of removal were contemplated, as that derived from a consideration of their unfitness and impropriety under the circumstances stated.
 

 The treaty of 1838 contemplated a removal to the tract west of‘the State of Missouri, and putting the Indians in possession of it. A large fund was appropriated, and in the hands of the Government, tó be disbursed in aid of - such removal, and of their support and encouragement after their arrival. It did not, therefore, separate these. Indians from the care and protection of the Government on its ratification, but contemplated further duties towards them, and for which means were supplied. Besides, the purchase-money for the reservations was to be paid to the Government; and, by the express terms of the treaty of 1842, the appraised value of the improvements was, on the
 
 surrender of the possessions, to be paid to the President of the United States, to be distributed among the owners of the improvements according to the award of the appraisers.
 
 This provision shows,
 
 *372
 
 that the Government was to be present at the surrender and payment for the improvements.
 

 The clause in that treaty of 1838 is stillwas, that the improvements were “to be paid by the United States to the individuals who were entitled to the same,” &c., “ on their relinquishing their respective possessions to the said Ogden and Eellows.” It is also worthy of remark, that the St. Regis Indians, one of the nine tribes of the Hew York Indians, m giving their assent to the treaty of 1838, deemed it necessary to guard against a forcible removal to the "West, by a clause providing that they “ shall not be compelled to remove under the treaty;” a removal to the West being in contemplation-
 

 We think, therefore, that the grantees derived no power, Tinder the treaty, ,to dispossess by force these Indians, or right of entry, so as to sustain an ejectment in a court-of law; that no private remedy of this nature was contemplated by the treaty, and that a forcible removal must be made, if made at all, under the direction of the Uuited States; that this interpretation is in accordance with the usages and practice of the Government in providing for the removal of Indian tribes from their ancient possessions, with the fitness and propriety of the thing itself, and with the fair import of the language of the several articles bearing upon the subject.
 

 An objection was taken, on the argument, to the validity of the treaty, on the ground that the Tonawanda band of the Seneca Indians were not represented by the chiefs and head men of the band in the negotiations and execution of it. But the answer to this is, that the treaty, after executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation, than they can behind an act of Congress. (1 Cranch, 103; 6 Pet., 735; 10 How., 442; 2 Pet., 307, 309, 314; 3 Story Const. Law, p. 695.)
 

 ) The view we have taken of the ease makes it unnecessary to .examine the ground upon which the learned court belovsr placed their decision; that court held the appraisal of the improvements, and payment therefor, were conditions precedent to the surrender of them by the Indians; and that the refusal of the Tonawanda band to permit the appraisal did not excuse the performance of these conditions. The ground upon which we nave placed our judgment is not in conflict with this view. We hold that the performance was not a duty that belonged to the grantees, but for the Government under the treaty.
 

 
 *373
 
 "We think the judgment of the court below right, and should he affirmed.