YOUNG et al. v. FELORNIA et al. (two cases)

No. 7772.   Decided May 21, 1952.   (244 P. 2d 862.)

See 42 C. J. S., Indians, sec. 25. Indian; and titles, recognition of. 27 Am. Jur., Indians, secs. 24-41; 76 A. L. R. 319.

*Knox Patterson, O. A. Tangren,* Salt Lake City, for appellants.

*McKay, Burton, McMillan & Richards, Senior & Senior,* Salt Lake City, *Donald T. Adams,* Monticello, for respondents.

McDONOUGH, Justice.

This is an appeal by defendants from a summary judgment. The motion for summary judgment was based upon the pleadings, the stipulations made at the pre-trial pro-

ceeding, and the issues as established by the court in its pre-trial order and summary.

The defendants are individual Navajo Indians who are joined in this action. They admit use and grazing of the lands involved, which are adjacent to the Navajo Indian Reservation, but allege that they do so under rights and continuous use handed down to them from time immemorial. They claim no fee in the lands but only exclusive grazing and possessory rights.

Plaintiffs are white livestock men who hold the land involved pursuant to permits issued under the Taylor Grazing Act and under lease from the State of Utah. They charged defendants with trespassing upon the land in dispute and asked for an injunction removing and restraining defendants from any further use of such land. Plaintiffs' motion for a summary judgment to this effect was granted by the lower court.

In respect to a summary judgment Rule 56(c), U. R. C. P. provides:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Under this rule, it is clear that if there is any genuine issue as to any material fact, the motion should be denied. In its conclusions of law the lower court decided:

"* * * that any such [aboriginal] rights, if any exist, have been forever barred, relinquished and disposed of by the provisions of the Treaty of 1868 and by the Act of Congress of March 1, 1933, which Treaty and Act have been set forth in the Findings of Fact herein, and by the fact that the United States, pursuant to an Act of Congress (Taylor Grazing Act) has assumed exclusive jurisdiction and control over the public domain lands heretofore described, and the State of Utah, pursuant to the enabling Act of this State, has acquired title to and jurisdiction over the state lands above described."

An examination of the pleadings and pre-trial stipulations reveals that the only possible issue of fact on which there may be some dispute is whether defenedants, who contend they are a separate and distinct band or clan of Navajos, were actually parties to and hence bound by the Treaty of 1868, 15 Stat. 667.

The Treaty of June 1, 1868 was between the United States

"and the Navajo nation or tribe of Indians, represented by their chiefs and headmen, duly authorized and empowered to act for the whole people of said nation or tribe".

Article 9 of the Treaty provided:

"In consideration of the advantages and benefits conferred by this treaty, and the many pledges of friendship by the United States, the tribes who are party to this agreement hereby stipulate that they will relinquish all right to occupy any territory outside their reservation, as herein defined, but retain the right to hunt on any unoccupied lands contiguous to their reservation * * *."

Article 13 provides:

"The tribe herein named, by their representatives, parties to this treaty, agree to make the reservation herein described their permanet home, and they will not as a tribe make any permanent settlement elsewhere * * *."

It has been uniformly recognized that aboriginal possession creates a possesory right legally enforceable against everyone but the United States. This right, however, may be extinguished by treaty. *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 62 S. Ct. 248, 86 L. Ed. 260; *Cramer* v. *United States*, 261 U. S. 219, 43 S. Ct. 342, 67 L. Ed. 622; *Buttz* v. *Northern Pacific Railroad Co.*, 119 U. S. 55, 7 S. Ct. 100, 30 L. Ed. 330; *Beecher* v. *Wetherby*, 95 U. S. 517, 525, 24 L. Ed. 440. The primary issue in this case is whether the 1868 treaty extinguished such aboriginal rights in the land outside the reservation. In construing Indian treaties we must follow

the principle that such construction must be in the sense which would be understood by the Indians, and not according to the technical meaning of the words. 27 Am. Jur. 548 and cases cited therein.

Upon application of this rule the understanding between the parties was clearly that the Indians were to move upon the reservation and were not to claim any rights of occupancy upon any territory outside of the reservation for any purpose whatsoever except for the expressly reserved right to hunt upon such lands. The evident intent was to relinquish all aboriginal rights of occupancy, except the right to hunt. In *United States* v. *Sante Fe Pacific Railroad Company,* supra [314 U. S. 339, 62 S. Ct. 257], in referring to tribal rights outside an Indian reservation, the court stated:

"In view of the long standing attempt to settle the Walapais' problem by placing them on a reservation, their acceptance of this reservation must be regarded in law as the equivalent of a release of any tribal rights which they may have had in lands outside the reservation. They were in substance acquiescing in the penetration of white settlers on condition that permanent provision was made for them too. In view of this historical setting, it cannot now be fairly implied that the tribal rights of the Walapais in lands outside the reservation were preserved. That would make the creation of the 1883 reservation, as an attempted solution of the violent problems created when two civilizations met in this area, illusory indeed. We must give it the definitiveness which the exigencies of that situation seem to demand. Hence, acquiescence in that arrangement must be deemed to have been a relinquishment of tribal rights in lands outside the reservation and notoriously claimed by others."

That this is the correct construction of the treaty in question is further indicated by the action of Congress in 1933, 47 Stat. 1418, when it created the Aneth Extention to the reservation and extinguished the rights of individual Indians to obtain the fee of land through allotments which had previously been allowed. The Act of 1933 provided:

"* * * That all vacant, unreserved, and undisposed of public lands within the areas in the southern part of the State of Utah

[comprising the Aneth Extension] be, and the same are hereby, permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as the Secretary of the Interior may see fit to settle thereon; Provided, That no further allotments of lands to Indians on the public domain shall be made in San Juan County, Utah, nor shall further Indian homesteads be made in said county under the Act of July 4, 1884 (23 Stat. 96, U. S. C., title 43, sec. 190)."

Congress by such enactment took cognizance of the fact that under the Act of 1884, Indians had certain allotment rights within San Juan County, Utah, and the withdrawal of those rights in consideration of the extension of the reservation is an indication that Congress recognized no other rights outside of the reservation except those mentioned. It is true, as appellant contends, that "allotments" does not include within its meaning aboriginal possessory rights. But the withdrawal of Indian allotment rights indicated that Congress believe that the aboriginal rights had theretofore been extinguished. It is not reasonable to suppose that Congress withdrew the allotment rights while recognizing the right of the Indians to occupy and wander over other portions of San Juan County not by the Act included in the reservation.

In the year following the passagee of the last mentioned Act, the Taylor Grazing Act was passed by Congress, 48 Stat. 1269, 43 U. S. C. A. § 315 et seq. By the terms of this Act the Secretary of the Interior was authorized in his discretion to establish grazing districts in an area aggregating not more than 142,000,000 acres of vacant, unappropriated and unreserved land of the public domain of the United States. Pursuant to such Act, a grazing district was created in the area in dispute. The creation of such district constituted an administrative interpretation of the Treaty of 1868. True, as asserted by appellants, the Taylor Grazing Act did not authorize the Secretary of the Interior to deprive Indians or others or property rights which they theretofore had on the public domain. But the creation of a grazing district in the area

was predicated upon the fact that the land was vacant, unappropriated and unreserved land of the public domain. The action was bottomed upon the assumption that no Indian tribal rights existed in such lands.

But defendants contend that, even assuming the correctness of what has heretofore been said in .this opinion, nevertheless defendants are not bound by the Treaty of June 1, 1868. They admit that they are the Navajo people, but contend that they are a band or clan ■ separate and distinct from the treaty Indians and consequently are not bound by the treaty. With this contention, we do not agree. Defendants admit and the record shows that they are of Navajo blood and that their ancestors were involved in the situations concerning the Navajo Indians prior to the treaty in question. The treaty stipulated that it was between the United States

"and the Navajo nation or tribe of Indians represented by their chiefs and head men, duly authorized and empowered to act for the whole people of said nation or tribe."

In light of this treaty stipulation, we can but apply the rule that the courts will not go behind a treaty which has been ratified to inquire whether an Indian tribe was properly represented by its head men. *United States* v. *New York Indians*, 173 U. S. 464, 19 S. Ct. 487, 43 L. Ed. 769; *United States* v. *Old Settlers*, 148 U. S. 427, 466, 13 S. Ct. 650, 37 L. Ed. 509 and cases cited therein; *Fellows* v. *Blacksmith*, 19 How. 366, 15 L. Ed. 684. In the last cited case, the court stated:

"An objection was taken, on the argument, to the validity of the treaty, on the ground that the Tonawanda band of the Seneca Indians were not represented by the chiefs and head men of the band in the negotiations and execution of it. But the answer to this is, that the treaty, after [it was] executed and ratified by the proper authorities of the government, becomes the supreme law of the land and the courts can no more go behind it for the purpose of annulling its effect and operation, than they can behind an act of Congress."

The parties to the Treaty of 1868 evidenced the intent to bind the entire Navajo nation. Defendants admit they belonged to this nation. The interest of each member of the tribe is divested by the tribal session. *United States* v. *Cherokee Nation,* 202 U. S. 101, 26 S. Ct. 588, 50 L. Ed. 949; *Eastern Band of Cherokee Indians* v. *United States,* 117 U. S. 288, 6 S. Ct. 718, 29 L. Ed. 880. The defendants, therefore, cannot escape the consequences of the treaty agreement. We conclude that they have no aboriginal rights in the public domain outside of the established reservation. In this view of the matter, the proffered issue as to the defendants belonging to a separate band or clan of the Navajos becomes immaterial. Consequently, disposing of the case by summary judgment was not error. The judgment of the lower court is affirmed. No costs are awarded.

WOLFE, C. J., and WADE, CROCKETT and HENRIOD, JJ., concur.