HATAHLEY ET AL. *v.* UNITED STATES.

No. 231.   Argued March 26–27, 1956.—Decided May 7, 1956.

*Norman M. Littell* argued the cause for petitioners. With him on the brief were *Marvin J. Sonosky* and *Frederick Bernays Wiener.*

*Roger P. Marquis* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Morton* and *S. Billingsley Hill.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioners, eight families of Navajo Indians, seek damages under the Federal Tort Claims Act for the destruction of their horses by agents of the Federal Government. The District Court allowed damages of $100,000 and enjoined the Government and its agents from further interference with petitioners. The Court of Appeals for the Tenth Circuit reversed, 220 F. 2d 666, on the ground that the Utah abandoned horse statute, Utah Code Ann., 1953, 47–2, was properly invoked by the government agents. We do not agree with the Court of Appeals.

Petitioners are wards of the Government. They have lived from time immemorial in stone and timber hogans on public land in San Juan County, Utah. This bleak area in the southeastern corner of the State is directly north of the Navajo Indian Reservation. While some Indian families from the reservation come into the area to graze their livestock, petitioners claim to have always lived there the year round. They are herdsmen and for generations they have grazed their livestock on this land. They are a simple and primitive people. Their living is derived entirely from their animals, from the little corn they are able to grow in family plots, and the wild game and pine nuts that the land itself affords.

The District Court found that horses, as petitioners' beasts of burden and only means of transportation, were essential to their existence.[1]

In 1934 the Government enacted the Taylor Grazing Act, 48 Stat. 1269, 43 U. S. C. § 315, which provided for the regulation and use of these public lands. Grazing permits were issued to white livestock operators, and for a number of years these permittees grazed their livestock in common with petitioners, who continued in peaceable occupation and use of the land they claimed as their ancestral home. Limited forage made disputes between the stockmen and the Indians inevitable, and about 1950 both the Government and the white livestock operators filed suits to remove the Indians from this land.[2] In

---

[1] For example, No. 13 of the Findings of Fact made by the District Court states: "Wood is the only fuel available to plaintiffs as a fuel for their fires, and it is necessary at certain times to travel by horse up to 15 or 20 miles to drag or haul wood to the camps or hogans. Water is also scarce and this must be carried by horse and burro for distances up to 10 miles from the camps. Trips to reach the pine nuts areas often require trips by horse for 150 miles, and to reach sites of certain ceremonies and other functions among the Navajo people often require plaintiffs and their families to travel on their horses for 150 miles. Seventy-five mile trips are required in their hunting expeditions which can only be done on horses. That the same use is made of burros as of horses by plaintiffs and the burro is held in the same esteem by them as are horses."

[2] The suit by the United States was dismissed by the District Court, 93 F. Supp. 745. The Court of Appeals reversed the dismissal and reinstated the complaint, United States v. Hosteen Tse-Kesi, 191 F. 2d 518. The suit was later dismissed by the District Court on June 27, 1953, for the reason that it was moot because the Indians had moved to the reservation and were no longer on the public lands. The suit brought by several white stockmen in a Utah state court resulted in an order enjoining certain Navajo Indians, including some of the petitioners, from trespassing and grazing livestock on the lands in question. Young v. Felornia, 121 Utah 646, 244 P. 2d 862. A petition for certiorari in this suit was pending before this Court at the time the roundup was started. Certiorari was subsequently denied, 344 U. S. 886.

addition to legal proceedings, another method was employed by the government agents. Beginning in September 1952 and continuing until sometime after the present suit was filed in the District Court, the Department of Interior's range manager vigorously prosecuted a campaign to round up and destroy petitioners' horses. This action was taken pursuant to the Utah abandoned horse statute, Utah Code Ann., 1953, 47–2, which provides that the Board of County Commissioners may authorize the elimination of "abandoned" horses on the open range. An "abandoned" horse is defined as one running at large on the open range which is either not branded or, if branded, one on which the tax for the preceding year has not been paid. During the roundup a total of 115 horses and 38 burros belonging to petitioners were taken and sold or destroyed. Some horses were sold locally. Some were shot and their carcasses left on the range. Most of the animals, however, were trucked some 350 miles away to Provo, Utah, where they were sold to a horse-meat plant or a glue factory. The total amount derived from such sales, about $1,700, has been retained by the District Advisory Board composed of local stockmen. No part of it has been paid or offered to petitioners.

There is considerable evidence in the record to show that the Utah abandoned horse statute was applied discriminatorily against the Indians. In one instance the assistant range manager watched from a bluff while petitioner Hosteen Sakezzie released his horses from their corral. Later, a short distance away, the same government agent supervised a roundup of these horses and drove them 35 miles through the night to another corral from which they were loaded into trucks for the horse-meat plant. Sakezzie and three other Indians trailed the horses to the entrucking point but were not allowed to reclaim them. On another occasion five horses taken during the roundup which belonged to white stockmen

were returned to their owners on the payment of a nominal $2.50 a head, but petitioner Little Wagon was told that to reclaim his horses the charge would be $60 a head, an amount known to be far above his means. For the most part, these and other facts found by the District Court were unchallenged in the Court of Appeals and are unchallenged here.[3]

The Court of Appeals did not reach the question of liability under the Federal Tort Claims Act, since it concluded that the government agents' actions were authorized by the Utah abandoned horse statute. We cannot dispose of this case so easily.

The Taylor Grazing Act seeks to provide the most beneficial use of the public range and to protect grazing rights in the districts it creates. *Chournos* v. *United States,* 193 F. 2d 321. Section 2 of the Act, 48 Stat. 1270, 43 U. S. C. § 315a, provides that the Secretary of the Interior shall "make such rules and regulations . . . and do any and all things necessary to accomplish the purposes of this Act." Pursuant to this authorization the Secretary has issued the Federal Range Code, 43 CFR § 161.1 *et seq.* Unauthorized grazing on the federal range and the removal of trespassing livestock is expressly provided for by § 161.11 (b) of this Code:

> "(b) *Unlawful grazing on Federal range; removal of livestock; impoundment.* Whenever the charge consists of unlawfully grazing livestock on the Fed-

---

[3] While the Government does not challenge particular findings, it does level a general charge that the trial was conducted in such an atmosphere of bias and prejudice that no factual conclusions of the court should be relied on. The Court of Appeals noted "that the case was tried in an atmosphere of maximum emotion and a minimum of judicial impartiality." 220 F. 2d, at 670. After oral argument and a thorough consideration of the record, however, we do not find that the trial was conducted so improperly as to vitiate these findings. See *Labor Board* v. *Donnelly Co.,* 330 U. S. 219, 236–237.

eral range, the notice served on the alleged violator . . . will order the alleged violator to remove the livestock or to cause them to be removed immediately or within such reasonable time as may be specified. If the alleged violator fails to comply with the notice the range manager may proceed to exercise the proprietary right of the United States in the Federal range, under local impoundment law and procedure, if practicable; otherwise he may refer the matter through the usual channels for appropriate legal action by the United States against the violator."

Whenever the charge consists of unlawfully grazing livestock, this section requires that written notice, as provided by § 161.11 (a),[4] together with an order to remove the livestock, be served on the alleged violator. Only "if the alleged violator fails to comply with the notice" may the range manager proceed under local impoundment law and procedure. It is clear that both the written notice and failure to comply are express conditions precedent to the employment of local procedures. The Code is, of course, the law of the range, and the activities of federal agents are controlled by its provisions.[5] They are required to follow the procedures there established.

---

[4] "§ 161.11  *Procedure for enforcement of rules and regulations*— (a) *Service of notice.* Whenever it appears that there has been any willful violation of any provision of the act or of the Federal Range Code for Grazing Districts, the range manager will cause the alleged violator . . . to be served with a written notice, which will set forth the act or acts constituting such violation and in which reference will be made to the provision or provisions of the act or the Federal Range Code for Grazing Districts alleged to have been violated. Such notice may be served in person or by registered mail and the affidavit of the person making personal service or the registry receipt shall be preserved."

[5] Section 16 of the Taylor Grazing Act, 48 Stat. 1275, 43 U. S. C. § 315n, reserves the power of the States to enforce "statutes enacted

The Court of Appeals held that there was no inconsistency between the federal regulation and the state statute because the regulation pertained to individual owners while the statute was aimed at "abandoned" horses running loose on the range. We cannot agree. As we read it, the Utah statute is directed not to horses abandoned in the sense that they are ownerless, or that their owners cannot be located, but rather to horses considered "abandoned" under an express statutory definition. As applied to horses "at large upon the open range," this definition depends only on branding and payment of prior tax assessment without any consideration of whether the horses are owned by someone and, if so, whether such owner is known or can be located. As the Court of Appeals itself recognized: "The dictionary definition of the term 'abandoned' has no application." 220 F. 2d, at 672. Furthermore, the record is replete with evidence that in this case the government agents actually did know that the horses belonged to petitioners and had not been abandoned. The District Court found that, "said agents knew beyond any possible doubt to whom said horses belonged"; that "the said agents and employees of defendant knew these brands to be the brands used by plaintiffs as well as they knew that the horses belonged to plaintiffs"; and concluded that the horses "were used daily in the performance of the work of their owners, the plaintiffs, and this was well known by defendant's said agents and employees." In the face of these findings, not disturbed by the Court of Appeals, it cannot be contended that the government agents were unable to comply with the specific provision for notice which regulated their actions. Nor has the Government contended that there

---

for police regulation" on the public range. Section 161.11 (b) of the Range Code provides the exclusive procedure for the invocation of such state statutes by federal agents.

was an attempt at any time to comply with the notice provisions of the Federal Range Code.

For these reasons we hold that the Utah abandoned horse statute was not properly invoked. The circumstances of this case were specifically provided for by § 161.11 (b) of the Federal Range Code, and the government agents failed to comply with the terms of that section because the requisite notice was not given.

But, having concluded that there was no statutory authority, we are faced with the question whether the Government is liable under the Federal Tort Claims Act for wrongful and tortious acts of its employees committed in an attempt to enforce a federal statute which they administer. We believe there is such liability in the circumstances of this case.

Section 1346 (b) of Title 28, United States Code, authorizes suits against the Government for "loss of property . . . caused by the negligent or wrongful act . . . of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act . . . occurred." It is clear that the federal agents here were acting within the scope of their employment under both state and federal law. Under the law of Utah an employer is liable to third persons for the willful torts of his employees if the acts are committed in furtherance of the employer's interests or if the use of force could have been contemplated in the employment. Cf. *Barney* v. *Jewel Tea Co.*, 104 Utah 292, 139 P. 2d 878. Both of these conditions obtained here. The federal agents were attempting to enforce the federal range law, and such enforcement must contemplate at least the force used in removal of stock from the range. The fact that the agents did not have actual authority for the procedure they employed does not affect liability.

There is an area, albeit a narrow one, in which a government agent, like a private agent, can act beyond his actual authority and yet within the scope of his employment. We note also that § 1346 (b) provides for liability for "wrongful" as well as "negligent" acts. In an earlier case the Court has pointed out that the addition of this word was intended to include situations like this involving "'trespasses' which might not be considered strictly negligent." *Dalehite* v. *United States,* 346 U. S. 15, 45.

Nor does 28 U. S. C. § 2680 bar liability here. This section provides that:

> "The provisions of this chapter and section 1346 (b) of this title shall not apply to—
>
> "(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

The first portion of section (a) cannot apply here, since the government agents were not exercising due care in their enforcement of the federal law. "Due care" implies at least some minimal concern for the rights of others. Here, the agents proceeded with complete disregard for the property rights of the petitioners. Nor can the second portion of (a) exempt the Government from liability. We are here not concerned with any problem of a "discretionary function" under the Act, see *Dalehite* v. *United States, supra.* These acts were wrongful trespasses not involving discretion on the part of the agents, and they do give rise to a claim compensable under the Federal Tort Claims Act.

The District Court awarded damages in the lump sum of $100,000, the amount sought by petitioners jointly. Apparently this award was based on the value of the horses, consequential damages for deprivation of use and for "mental pain and suffering." Under the Federal Tort Claims Act, damages are determined by the law of the State where the tortious act was committed, 28 U. S. C. § 1346 (b), subject to the limitations that the United States shall not be liable for "interest prior to judgment or for punitive damages," 28 U. S. C. § 2674. But it is necessary in any case that the findings of damages be made with sufficient particularity so that they may be reviewed. Here the District Court merely awarded the amount prayed for in the complaint. There was no attempt to allot any particular sum to any of the 30 plaintiffs, who owned varying numbers of horses and burros. There can be no apportionment of the award among the petitioners unless it be assumed that the horses were valued equally, the burros equally, and some assumption is made as to the consequential damages and pain and suffering of each petitioner. These assumptions cannot be made in the absence of pertinent findings, and the findings here are totally inadequate for review. The case must be remanded to the District Court for the appropriate findings in this regard.

Since the District Court did not possess the power to enjoin the United States, neither can it enjoin the individual agents of the United States over whom it never acquired personal jurisdiction. That part of the Court of Appeals judgment dissolving the injunction is affirmed. The remainder of the judgment is reversed and remanded to the District Court for proceedings not inconsistent with this opinion.

*Reversed and remanded.*