David Roger LETTSOME, Plaintiff-Appellee,

v.

The **UNITED STATES** of America, Defendant-Appellant.

No. 26486.

United States Court of Appeals Fifth Circuit.

May 20, 1969.

William A. Meadows, Jr., U. S. Atty., Miami, Fla., Alan S. Rosenthal, Robert M. Heier, Attys., Dept. of Justice, Edwin L. Weisl, Jr., Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., for appellant.

Arthur Roth, William Clinton Green, Jesse D. Henry, and Irma Robbins Feder, of Green & Hastings, Miami, Fla., for appellee.

Before PHILLIPS,* BELL and MORGAN, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

Lettsome brought this action against the United States under the Suits in Admiralty Act (46 U.S.C.A. §§ 741–752) and the Public Vessels Act (46 U.S.C.A. §§ 781–790) to recover damages for personal injuries.

The trial court found the injuries resulted from the unseaworthiness of a United States Navy motorboat (a Boston Whaler) and the negligence of the United States, and entered judgment for Lettsome. The United States has appealed.

Lettsome majored in geology at Cornell College at Mount Vernon, Iowa, and received a B.A. degree in geology from that institution. He also took a short postgraduate course at Miami University at Oxford, Ohio. After completing his education, he served as a highway engineer for the Cook County Illinois Highway Department and became proficient, through experience, in the testing of construction materials. Prior to January 23, 1965, the date on which Lettsome was injured, the Pittsburgh Testing Laboratory had entered into a contract with the United States Navy to test, in accordance with the procedures of the ASTM,[1] construction materials to be used by the Navy at the AUTEC Naval Base at Andros Island, Bahamas, British West Indies. On and prior to January 23, 1965, Lettsome was employed by Pittsburgh as a testing engineer to carry out such contract and to do the testing thereunder. Included in his duties were the taking and testing of water samples at all stations connected with the Base.

Lettsome was an employee under the Defense Bases Act (42 U.S.C.A. § 1651).

The living quarters area at the Base is separated from the military area by Fresh Creek, a navigable stream approximately 100 yards wide. The Navy provided transportation both ways across the creek for both civilian and naval personnel by means of an outboard-motor-driven ferry, with a capacity of eight passengers, and the Boston Whaler, an 18-foot boat, powered by a 75 H.P. Evinrude outboard motor and an 18 H.P. outboard motor.

The Whaler was available for use by naval and civilian personnel at the Base for both business and recreational purposes.

Prior to January 23, 1965, an epidemic of hepatitis had developed among both the naval and civilian personnel at the Base and at down-range sites. The term "down-range sites" referred to installa-

---

* Of the Tenth Circuit, sitting by designation.

1. American Society for Testing Materials.

tions the Navy had under construction on Fresh Creek, south of the main Naval Base. Lettsome and his wife were among the first persons to contract the disease.

At about noon on January 23, 1965, Lt. Commander W. F. Daniel, the Base Commandant, contacted Lettsome and advised him that a United States Navy medical team had come to the Base to endeavor to determine the source of the hepatitis then prevalent at the Base and down-range sites and to administer gamma globulin as a preventative vaccine. Daniel ordered Lettsome to make himself, his staff, and his testing facilities available to the medical team. He explained to Lettsome that the medical team would want to test the water from the Navy's own sources of supply at the Base and at down-range sites and also from the sources of supply of local people in the vicinity as far away as 12 miles from the Base, and would want to obtain water samples from all of such sources. Daniel was assured by Lettsome that he would make his automobile available to the medical team for travel to places accessible by land transportation and provide water transportation for them to reach places not accessible by land transportation. As a result of the conversation between Daniel and Lettsome on January 23, 1965, it clearly appears that it was understood by them that in compliance with Daniel's orders Lettsome would provide the medical team with ground transportation by automobile to places accessible by land and by the Whaler to places accessible only by water, for the purpose of obtaining water samples to be tested for hepatitis bacteria and would assist them in obtaining and testing the samples.

Lettsome had planned to use the boat to take his father fishing the afternoon of January 23, 1965, but because of developing bad weather and the fact the medical team would need his assistance and the use of the boat, he had abandoned his fishing plans.

Thomas T. Gaulden, a civilian naval employee at the Base, had custody of the boat. It was also his duty to arrange for needed repairs of the motors. Sometimes a mechanic from Nassau came to the Base and repaired the motors and sometimes the motors were sent to the United States mainland to be repaired.

In order to facilitate the use of the boat, Gaulden usually left the keys at the Base Yacht Club, near which the boat was ordinarily docked, and where either civilian or naval employees at the Base could obtain them conveniently. However, if the boat or its motors were out of order, Gaulden personally kept possession of the keys.

Upon receiving the instructions from Daniel to assist the medical team, Lettsome went to the Yacht Club to obtain the boat keys. On learning they were not there, Lettsome went back to the Base, contacted Gaulden, and asked him for the keys, explaining to him that he wanted to check out the boat and have transportation available for the medical team when it was needed.

Lettsome had used the boat the preceding Wednesday and had experienced no trouble with it. He had heard that the clutch was giving some trouble when the boat was operated at high speeds, but he had no idea what specifically was wrong with the clutch nor in what way it was malfunctioning.

When Lettsome asked Gaulden for the keys, Gaulden told Lettsome the boat "was out of commission at the present time because of the engine."

A mechanic, who normally repaired the engines, had told Gaulden the clutch was defective. Gaulden testified, "To my knowledge, sir, we had a slipping clutch in the engine." A slipping clutch is one that disengages the gears and leaves the engine running in neutral. Gaulden at no time told Lettsome the clutch was slipping.

Lettsome told Gaulden that he (Lettsome) would get Wilfred Mackey, the Dockmaster at the Yacht Club, to help him and he believed they could determine what was wrong with the clutch

and repair it, and if they could not repair it he would not use the boat.

Thereupon, Gaulden gave Lettsome the keys.

Lettsome testified he had heard a rumor "that there was some problem with the gear"—that "they were having some problems with the boat and [at] its higher speeds."

When asked on cross-examination if he did not have "a vague idea that there was some difficulty with the gears engaging or slipping or something along that line?", Lettsome answered, "I had no idea what it was." When asked on cross-examination, "Did Mr. Gaulden tell you that the clutch was not operating properly, or the gear shift?", Lettsome answered, "No." Gaulden did not testify he had so told Lettsome.

When asked on cross-examination, "Did you tell Mr. Gaulden that you knew that the clutch, or whatever you want to call it, was not operating properly?", Lettsome answered, "No, I told him I had heard it rumored that it was something to that effect."

Thus, it will be seen that there was substantial evidence that while Lettsome had heard rumors that the clutch was giving some trouble when the boat was operated at higher speeds, he had no knowledge of what the particular clutch defect was, or that the clutch was slipping out of gear when the boat was operated at high speed, or what specifically was wrong with the motor.

Lettsome contacted Mackey and asked him to help repair the clutch. Mackey told Lettsome he had to take some bills to the Yacht Club, but would be available shortly. Lettsome then proceeded to take the boat out for a trial run, in an endeavor to determine the way in which the clutch was malfunctioning. He started the large motor and ran the boat upstream about one-half mile. He started at low speed and gradually accelerated the motor until it reached high speed and experienced no trouble with the mo-

tor. He then slowed down and turned around and gradually accelerated the motor from law to high speed and the motor was apparently performing normally. He was about to decelerate and turn around, when suddenly there was a complete loss of power and the boat changed from a planing position and its bow nosedived into the water so violently that it threw Lettsome from a standing position, with his hands grasping the steering wheel, out of the boat and into the water on the incoming tide side of the boat. Lettsome testified that when the loss of power occurred, he felt a "tremendous force" against him, that "ripped" his hands from the steering wheel and threw him upward and out into the water. As Lettsome landed in the water, the boat began to move in a circle. The tide was running strongly and on the second or third circle the boat's propeller struck Lettsome's right hand, wrist, and forearm, causing painful, serious, and permanent injuries.

Mackey had completed the task he was finishing when Lettsome contacted him and was returning to the dock, when he heard sounds like the motor would make while running at high speed when the clutch slipped into neutral positon and disengaged the gears driving the propeller shaft and then quickly slipped back into drive position and reengaged the gears driving the propeller shaft. The evidence developed that that was what had occurred.

Mackey hurried to the dock and saw the boat circling and Lettsome in the water calling for help. Before Mackey could reach Lettsome, some persons on the ferry boat had rescued him. Mackey then went to the boat and discovered that a spring, which holds the ball of the swivel element of the steering mechanism in position, was out, which resulted in a disconnection in the steering mechanism and caused it to cease functioning. The evidence established and the court found that when the steering mechanism so becomes inoperative, the motor will

swing to an extreme position from the center.[2]

There is no evidence in the record, in our opinion, which could support a finding that either the spring or swivel joint were in anywise defective before the clutch disengaged, causing the boat to lose power and the bow to nosedive into the water and the stern to rise up; and the court did not find that either the spring or swivel element was defective prior to the disengagement of the clutch.

There was expert evidence that a tremendous force exerted on the steering mechanism of the Whaler would cause the spring in the swivel element, even if such spring was in normal condition, to disengage; and that disengagement of the spring, resulting in damage to the swivel element, would likely occur when the steering mechanism of the Whaler was subjected to the following stresses:

The stress caused by the abnormally high RPM's[3] at which the motor ran, while the clutch was disengaged and the throttle was set in high speed position;

The jar to and the strain on the steering mechanism, which resulted when the bow of the Whaler nosedived into the water and the stern and motor rose so high that the propeller was above the water level;

The stress on the steering mechanism, caused by the exceedingly high speed at which the propeller ran, after the clutch reengaged with the throttle set in high speed position, and while the propeller was above the water level;

And finally, the stress on the steering mechanism that occurred when, with the motor running at very high speed, the stern and motor lowered and brought the propeller into impelling contact with the water.

■ The trial court found that the "broken steering mechanism rendered the vessel unseaworthy as a proximate contributing cause of Plaintiff's (Lettsome's) injuries" and that the "defective clutch was an additional contributing factor in causing Plaintiff's (Lettsome's) injuries."

However, as stated above, the evidence failed to establish that the steering mechanism was damaged or defective, or for that reason that the boat was unseaworthy before the clutch disengaged while Lettsome was operating the boat to determine the defect in the clutch.

Until the clutch disengaged, the only unseaworthiness established by the evidence was the defective clutch.

We are of the opinion that the only reasonable conclusion that can be drawn from the evidence is that it was the disengagement of the defective clutch which caused Lettsome to be thrown out of the boat and into the water, and that it was the tremendous force generated by the disengagement and reengagement of the defective clutch, while the motor was running at extremely high speed, which damaged the swivel joint and

---

2. The steering of an outboard-motor-driven boat is effected by the positioning of the line of thrust of the propeller. If the thrust is forward and the motor is aligned or parallel with the center line of the boat, from the stern to the bow thereof, the boat will move approximately straight ahead. If the thrust is forward and the motor is swung to the right or toward the starboard side of the boat so the line of thrust is to the left of center, the boat will turn to the right, and conversely, if the motor swings to the left or toward the port side of the boat so the line of thrust is to the right of center, the boat will turn to the left. If the thrust is backward, the opposite will result.

The position of the motor and the line of thrust of the propeller are controlled by the steering wheel, the turning of which actuates a cable connected with the wheel and extending from it to and connected with an arm on the motor. Such arm is in turn actuated by the movement of the cable and functions to swing the motor either to the right or to the left and thus fixes the line of thrust of the motor.

3. Revolutions per minute.

caused the steering mechanism to cease functioning and the boat to circle and the propeller to strike Lettsome.

■ It is a general rule in both negligence and unseaworthiness cases that when a person employed to repair a defect in a machine, structure, or other thing, suffers personal injuries while making such repairs, caused by the very defect he is employed to repair, he may not recover damages for such injuries from his employer.[4]

But we do not think the rule applies to Lettsome, under the unusual facts of this case.

Ordinarily, a person employed to repair a defect in a machine, resulting from wear, misuse, damage, breakage, or other cause, is a person skilled in the art in which the thing to be repaired lies. Lettsome was not a mechanic, skilled in the art of repairing outboard motors, which requires a considerable amount of training and experience. True, he had some knowledge of outboard motors, and no doubt was able to make ordinary adjustments and minor repairs.

When Lettsome asked for the boat keys and advised Gaulden that he wanted to check the boat and have it ready for the medical team, Gaulden merely told him the motor was defective. Although Gaulden knew the clutch was slipping at high speeds, that is, was disengaging the gears and putting the clutch setting in neutral position, he did not advise Lettsome of that fact, and when Lettsome advised Gaulden he would get the Dockmaster, Mackey, and they would endeavor to locate the trouble and repair it if they could, and if they could not repair it, Lettsome would not use the boat, Gaulden turned the keys over to Lettsome, and again failed to tell Lettsome the clutch was slipping and warn Lettsome of the danger of operating the boat at high speed.

The foregoing no doubt was the basis of the court's finding that Lettsome only volunteered to make minor repairs and that as a result of "defendant's" (the United States) negligence Lettsome suffered severe injuries.

Lettsome had used the boat on the previous Wednesday, January 20, 1965, and had experienced no trouble with it. He no doubt believed the clutch trouble was minor, and could be repaired by him and Mackey.

From the foregoing, it seems clear to us that Lettsome did not volunteer or agree to repair a slipping clutch or any other particular defect in the clutch or the motor. He merely offered or agreed to endeavor to ascertain what the defect was, which Gaulden for some unaccountable reason kept from him, and repair it, if he could, with Mackey's help.

Hence, Lettsome's voluntary offer to repair the defect in the clutch was subject to two conditions when Gaulden impliedly accepted it by turning the boat keys over to Lettsome. One condition was that Lettsome would be able to determine in what way the clutch was defective, viz., the character of the defect, and the other condition was that the defect was one which he and Mackey could repair, viz., was within the competency of him and Mackey, who were not skilled outboard motor mechanics, to repair. Neither of such conditions ever occurred, and Lettsome's offer never became a firm one. He was not engaged in repairing a slipping clutch or any clutch or other motor defect when the

4. Byars v. Moore-McCormack Lines, Inc., 2 Cir., 155 F.2d 587, 588; Kowalsky v. Conreco Co., 264 N.Y. 125, 190 N.E. 206, 207; Armento v. United States, D.C.E.D.N.Y., 74 F.Supp. 198, 200; De La Pena v. Moore-McCormack Lines, Inc., D.C.S.D.N.Y., 84 F.Supp. 698, 700; Bruszewski v. Isthmian S. S. Co., 3 Cir., 163 F.2d 720, 722; Pinion v. Mississippi Shipping Co., D.C. E.D.La., 156 F.Supp. 652, 656; See also, Filipek v. Moore-McCormack Lines, Inc., 2 Cir., 258 F.2d 734, 737.

accident occurred. Since his offer to repair the clutch was conditional and never came into being, he did not suffer personal injuries while repairing the clutch, and such injuries clearly were not caused by a defect he had agreed or offered to repair.

■ We think the evidence warranted the court in finding and concluding that Gaulden's failure to advise Lettsome that the particular defect was a slipping clutch and warn him of the danger of operating the boat at high speed in an effort to ascertain the character of the defect was negligence for which the United States was liable, and that such negligence was the proximate cause of the injuries suffered by Lettsome.

■ Whether, under the existing circumstances, Lettsome was guilty of contributory negligence, was an issue raised by the United States and not passed on by the trial court. We think the evidence on that issue presented a question of fact, which the trial court should have determined.

■ We also think the trial court, under the requirements of Rule 52(a) of the Federal Rules of Civil Procedure, should have found separately the amount of damages for loss of earnings and the amount of damages for pain and suffering to which Lettsome was entitled.[5]

If the court finds Lettsome was guilty of contributory negligence, it should determine the amount by which his damages should be mitigated on account thereof and reduce the amount of his damage award accordingly.[6]

Remanded for further proceedings in accordance with the views herein expressed.

---

5. Hatahley v. United States, 351 U.S. 173, 182, 76 S.Ct. 745, 100 L.Ed. 1065; Major Appliance Co. v. Gibson Refrigerator Sales Corp., 5 Cir., 254 F.2d 497, 502.

6. Manning v. M/V Sea Road, 5 Cir., 358 F.2d 615, 617.