10 F.3d 13
 304 U.S.App.D.C. 35
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
CORT FURNITURE RENTAL CORPORATION, Appellee,
v.
Calvin CAFRITZ, Appellant.
 No. 92-7085.
 United States Court of Appeals, District of Columbia Circuit.
 Nov. 15, 1993.
 
 Before: WILLIAMS, SENTELLE and HENDERSON, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This appeal was heard on the record from the United States District Court for the District of Columbia and on the briefs filed by the parties and arguments by counsel. The court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir.Rule 14(c). For the reasons set out in the accompanying memorandum, it is
 
 
 2
 ORDERED and ADJUDGED that the judgment of the District Court be vacated and the matter be remanded for a new determination of damages.
 
 
 3
 The clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 15(b).
 
 MEMORANDUM
 
 4
 Appellant Cort Furniture Rental Corporation (Cort) brought this action seeking damages for breach of contract by its lessor, appellant Calvin Cafritz (Cafritz). Specifically, Cort alleged Cafritz breached a lease provision prohibiting him from "unreasonably" withholding consent to renovation of the leased premises. The district court conducted a five-day bench trial and on April 2, 1992, issued Findings of Fact and Conclusions of Law (Opinion) and an Order of Judgment which found Cafritz in breach of the cited lease provision and awarded Cort damages of $300,000 for lost profits. Cafritz appeals only the damage award. Because the district court failed to adequately support or explain its award, we vacate the award and remand for redetermination of the damages, if any, to which Cort is entitled.
 
 
 5
 The facts, as found by the district court, are largely undisputed. In 1983, Cort, an office furniture rental company, began to lease showroom space from Cafritz in downtown Washington, D.C. The initial lease was for the period July 1, 1983, to October 31, 1988, and provided for two five-year renewals, subject to certain specified conditions. In addition, the lease stipulated: "Landlord shall not unreasonably withhold his written consent to any alterations, decorations, additions or improvements in or to the demised premises to be made by Tenant." Joint Appendix (JA) 53 p 39.
 
 
 6
 The parties' lease relationship ran smoothly until 1989 when, as the district court found, "the future of the building was uncertain" because of its age and condition, a local trend of new construction and the probability that the building's primary tenant, the Federal Government, would not renew its lease. Opinion at 2. In Autumn 1989, Cafritz, unbeknownst to Cort, which had renewed its lease for a second five-year term through the end of October 1993, decided to demolish the building and redevelop the property, provided he could acquire neighboring properties to develop as well. About the same time Cort's new area sales manager, having learned that a major competitor was contemplating opening a showroom nearby, recommended that Cort renovate its showroom. Accordingly, Cort drew up renovation plans with the expectation of completing the remodelling by Christmas 1989 or early January 1990 at a cost of about $100,000.
 
 
 7
 Initially, Cafritz's management agents indicated the proposed renovation would be approved and in late October 1989 Cort formally submitted its plans to Cafritz along with a cover letter stating: "Since the proposed plans represent a substantial investment on our part in the Premier Building, we are interested in negotiating an additional five year renewal option." JA 61. Cort received no official response to its proposal until early December 1989 when it was informed, through a real estate broker, that Cafritz planned to raze the building and redevelop the entire block on which it stood. Cort was also informed Cafritz wished to buy out the remainder of Cort's lease and the parties soon began buy-out negotiations.
 
 
 8
 The district court noted that "[i]t is during this period from December 1989 through April 1990 that the most hotly litigated events took place," Opinion at 4, and made a number of findings resolving disputed facts: (1) during the negotiations the parties maintained, and communicated to each other, differing interpretations of the lease renewal clause: Cort believed it was entitled as a matter of right to a second five-year extension from November 1993 through October 1998, while Cafritz believed he was under no contractual obligation to renew and intended not to do so;[1] (2) during the negotiation period Cort discovered its competitor would not be opening a D.C. showroom; and (3) Cort effectively suspended its demand for renovation approval during the negotiation period but "by early April 1990, Cort did renew its request for renovation approval with Cafritz, and Mr. Cafritz, from that point, acted unreasonably in withholding his approval of the plans," id. at 4-5. The court further found that in March 1991 Cafritz began to reasonably consider Cort's renovation proposal. These findings are not contested on appeal and, in any event, must be accepted as true because not clearly erroneous. Anderson v. Bessemer City, N.C., 470 U.S. 564, 573 (1985) (citing Fed.R.Civ.P. 52(a)).
 
 
 9
 Based on its findings, the court next concluded Cafritz was "in breach of the lease from the beginning of April, 1990" but that "by the end of March 1991, he "was no longer in breach." Accordingly, the court determined it should "consider the damage claim in relation to the period of the breach--from April 1, 1990 to March 30, 1991" and that "[a]llowing an estimated three-month period to complete the renovation work contemplated, the Court must therefore direct its attention to profits for a period of 12 months, from July 1, 1990 to June 30, 1991." Id. at 7. It is the court's determination of damages for this one-year period that is at issue here.
 
 
 10
 Cafritz contends the $300,000 damage award cannot stand because (1) the evidence, as accepted by the district court, fails to demonstrate that Cafritz's contractual breach caused any damage to Cort; (2) recovery of lost profits is foreclosed under the "foreseeability" rule of Hadley v. Baxendale, 156 Eng.Rep. 145 (1854), as adopted by the D.C. courts, and (3) the amount awarded is unsupported by the evidence. Whether or not the district court's damage award is justified under the applicable law or supported by the evidence, we conclude it must be vacated because the court's opinion failed in three respects to adequately explain the award.
 
 
 11
 First, the district court gave short shrift to the question of causation, stating only that "[i]t is a well established tenet of contract law that expectation damages should be awarded to a party harmed by breach of a contract, provided that those damages can be calculated with reasonable certainty," and that "Cort has established by a preponderance of the evidence that Cafritz's refusal to authorize renovation of the showroom ... caused Cort a loss of profit of $300,000." Opinion at 7, 10. The court made no specific findings and cited no evidence to show that Cort in fact suffered damages from Cafritz's breach. See Manes v. Dowling, 375 A.2d 221 (D.C.1977) ("The general rule regarding damages is that the plaintiff must prove that the damages were in fact the direct result of the injuries caused by the defendant.").
 
 
 12
 Second, the court made no finding that the lost profits it awarded were a foreseeable consequence of breach at the time the parties entered the lease, a prerequisite to recovery under D.C. law. See Fowler v. A & A Co., 262 A.2d 344, 349 (D.C.1970) ("When two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it.") (citing Hadley v. Baxendale, 156 Eng.Rep. 145 (1854)).
 
 
 13
 Finally, and most significantly, the Court provided no clear explanation of how it arrived at the $300,000 damage figure. "While damage awards are findings of fact which will not be disturbed unless clearly erroneous, it is essential that the trial court give sufficient indication of how it computed the amount so that the reviewing court can determine whether it is supported by the record." Eureka Inv. Corp. v. Chicago Title Ins. Co., 743 F.2d 932, 939 (D.C.Cir.1984) (citing Hatahley v. United States, 351 U.S. 173, 182 (1956)); see also Safer v. Perper, 569 F.2d 87, 100 (D.C.Cir.1977) ("[T]he measure of damages and method of computation [must] be exposed so as to inform the litigants and afford a possibility of intelligent review."). When a trial court fails to explain its award sufficiently, appellate review is impossible and remand is required. See Eureka, 743 F.2d at 940; Safer, 569 F.2d at 100. Such is the case here.
 
 
 14
 After rejecting as unreliable Cort's expert testimony on the amount of lost profits,[2] the court concluded that "[t]o calculate damages, the best approach would clearly be to start by ascertaining what effect the managers of Cort expected the renovation would have on the earnings of the showroom in question." Opinion at 9. The court then stated:
 
 
 15
 Only one estimate, unrecorded at the time, is available. An experienced sales manager, who recommended renovation and initiated the idea, estimated that renovation would enhance showroom revenues by 9.7%. This is the only proof of any consideration in terms of long- or short-term strategy. There are no computations underlying this informed guess in evidence. The estimate was made in mid-1989, and the Court must project damages from mid-1990. Moreover, a different renovation was ultimately adopted by Cort in 1991, and there is no evidence indicating which features of either renovation were thought likely to attract revenue and which were not. Many questions remain unanswered. Nonetheless, that one estimate is the only contemporaneous benchmark available for projecting lost profits. The Court accepts the estimate at face value, subject to the infirmities noted, finding no ground to believe--despite the testimony of Cort's witness--that it was significantly tilted to the low side. The Court also has available a responsible computation made by Cort's expert, Mr. Miller, of what the amount of lost profits would have been for 1990, assuming a 10% revenue increase and using 1989 as a base year. After considering all the facts and circumstances as outlined herein, the Court finds that Cort has established by a preponderance of the evidence that Cafritz's refusal to authorize renovation of the showroom breached the lease and caused Cort a loss of profit of $300,000.
 
 
 16
 Id. at 9-10. The court's summary damage computation leaves too much to speculation.
 
 
 17
 The figures on which the court relied are readily identifiable. Joe Porpiglia, the "experienced sales manager" identified by the district court, testified that in 1989 he projected a 9.7% revenue increase after renovation, a figure which he included in a 1990 budget proposal admitted at trial. JA 1096. Further, Frederick Miller, an accountant and one of Cort's expert witnesses, provided, as found by the court, a "responsible computation" of lost profits, using a 10% post-renovation growth rate and an 82.17% profit margin to estimate total lost profits for the year 1990 of $375,722. JA 134-35. What remains undiscernible from the court's opinion, however, is how it extrapolated from the cited figures its damage award of $300,000, a figure substantially lower than Miller's, for a period (July 1, 1990 to June 30, 1991) that only partially overlaps the one for which Miller computed lost profits.[3] Nor is it clear how, if at all, the court may have taken into account the costs of renovation, originally estimated at $100,000. These lacunae in the district court's reasoning preclude meaningful review of its damage award.
 
 
 18
 For the preceding reasons, we vacate the district court's damage award and remand for a new damage determination supported by more detailed findings. On remand, the court has discretion, of course, to rely on the existing record or to take additional evidence as it deems necessary.
 
 
 
 [1]
 Each side persisted in its interpretation of the provision until October 8, 1991, when the district court resolved the issue in Cafritz's favor, holding that the renewal clause "simply expresses a willingness on the part of Cafritz to consider the possibility of a further extension of the lease if Cort gives notice during the month of April 1993." JA 25
 
 
 [2]
 The Court found the expert estimates "extremely problematic in terms of their projection of profits," primarily because they relied on comparisons to other Cort stores not similarly situated
 
 
 [3]
 Miller also computed lost profits for the first seven months of 1991 of $385,111, based on a 5% growth rate. JA 134-35