**Ronald BATTISTA and Arlene Battista, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 92 Civ. 1424 (AGS).**

United States District Court,
S.D. New York.

May 31, 1995.

**718**

Schneider, Kleinick & Weitz, P.C., New York City, for plaintiffs.

Mary Jo White, U.S. Atty. S.D.N.Y., New York City, for defendant.

*Opinion and Order*

SCHWARTZ, District Judge:

Plaintiffs Ronald and Arlene Battista bring this personal injury action against the United States Government, alleging *inter alia* negligence and violation of New York State labor laws, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) *et seq.* More precisely, the action seeks to recover for economic and non-economic losses allegedly suffered by plaintiffs as a consequence of an accident involving Mr. Battista on February 13, 1991, at which time he was splicing telephone cable at a United States Post Office. This Court conducted a bench trial of this matter on November 29–30, December 1, and December 4, 1994.

The Court's findings of fact and conclusions of law are set forth below in the following manner. In the Factual Background section below, we make certain factual findings with respect to the events up to and including the accident that serves as the basis for this action. Based on these factual findings, we set forth our conclusions of law with respect to liability in the first section of the Discussion *infra* at 721–724. Finally, for

purposes of clarity we set forth our factual findings and conclusions of law with respect to damages together in the final section of the Discussion *infra* at 724–729.

**FACTUAL BACKGROUND**

1. Plaintiff Arlene Battista is married to Ronald Battista.

2. Plaintiff Ronald Battista was employed by New York Telephone Company ("N.Y. Telephone" or "NYNEX") as a cable splicing technician from 1965 until September 1994. Tr. 18.[1]

3. As part of their duties, NYNEX cable splicing technicians install cable in buildings, backyards and manholes. NYNEX assigned Mr. Battista to install cable in Manhattan in an area bounded by 27th and 43rd Streets from Fifth Avenue to the West Side Highway. Tr. 18–19.

4. The United States Postal Service operates a postal facility located at 223 West 38th Street in Manhattan (the "Midtown Station").

5. Midtown Station contains a network of lookout galleries for the use of the postal inspectors. The galleries, which are not open to the public, are tunnels running through various areas of the post office and contain one way mirrors through which inspectors are able to observe, for law enforcement purposes, various activities at the post office. The lookout galleries are only accessible by fixed ladders located in shaftways behind locked doors in the post office. Declaration of Albert Smith ("Smith Decl.") ¶¶ 4–7.

6. On February 11, 1991, Mr. Battista commenced work splicing cable for New York Telephone at the United States Post Office, Midtown Station, 223 West 38th Street, New York, New York. Frank Russo, a cable splicing technician's helper employed by New York Telephone assisted Mr. Battista. Declaration of Ronald Battista ("Battista Decl.) at 2.

7. Mr. Battista and Mr. Russo were at the station to lay a cable next to one that Mr.

1. "Tr." refers to the trial transcript. "PX" refers to plaintiffs' exhibits. "GX" refers to the Government's exhibits. As is this Court's practice, all direct testimony at trial was submitted by affidavit. Accordingly, "——— Decl." refers to the direct testimony of the witness in question.

Battista had laid in the mid–1980s to provide service to the entire block where the Midtown Station is located. Tr. 18–19.

8. The cable that Mr. Battista was laying was to provide feeder relief due to congestion. PX 1.

9. There were no telephone service problems at the Midtown Station before Mr. Battista and Mr. Russo were working there in February 1991 nor any service improvement after the work was finished. Declaration of Cosmo Violanti ("Violanti Decl.") ¶ 4.

10. No USPS employee instructed Mr. Battista or Mr. Russo with respect to their cable splicing work at Midtown Station.

11. On February 13, 1991, Mr. Battista determined that he and Mr. Russo required access to a postal inspector's lookout gallery located between the first floor and the basement level of Midtown Station in order to lay cable. Tr. 20.

12. Mr. Battista had a schematic diagram of the layout of the post office which indicated that the lookout gallery for which he sought access was located between the first floor and the basement level of Midtown station. PX–1.

13. Mr. Battista approached Albert Smith, the superintendent of Midtown Station, for access to the postal inspector lookout gallery. Tr. 20.

14. Mr. Smith gave Mr. Battista and Mr. Russo access to the lookout gallery from a fixed ladder located in a shaftway behind a locked door on the first floor of Midtown Station. Tr. 21; Smith Decl. ¶¶ 14–17.

15. The fixed ladder in the shaftway where Mr. Battista fell is attached to the wall of the shaftway and has handrails running along the length of the ladder. On the day of Mr. Battista's fall, the ladder was firmly attached to the wall and had no loose rungs or other defects. Smith Decl. ¶ 6; Tr. 54.

16. There was a metal chain that can extend across the shaftway in the gallery between the first floor and the basement in the Midtown Station. Smith Decl. ¶ 6.

17. The opening through which the fixed ladder continues (the "ladder shaft") to the basement level measures 27 inches by 28 inches.

18. The gallery level is six feet below the first floor and six feet above the basement. Smith Decl. 9; Tr. 25–26.

19. After opening the locked door on the first floor, and before Mr. Battista entered the lookout gallery, Mr. Smith told Mr. Battista and Mr. Russo to be careful and that they needed to get plenty of light in order to work there. Tr. 21; Smith Decl. ¶ 16. The gallery and vertical ladder way in issue had no illumination. Undisputed Fact 16. Mr. Smith testified that the Spy Gallery in question at one time had lights, but those lights burned out seven or eight years ago. He admitted, moreover, that he had failed to replace the lights even though it was his duty to do so.

20. No USPS employee or other person informed Mr. Battista or Mr. Russo that the ladder shaft continued below the gallery level to the basement. Battista Decl.; Russo Decl.

21. Cosmo Violanti, Operations Manager for the Post Office, testified on cross-examination that he was unaware of the hazard posed by the continuation of the ladder shaft from the lookout gallery to the basement. Tr. 204.

22. OSHA regulations in effect on February 13, 1991 required lighting in the ladder shaft area and the landing. 29 CFR 1910.37(q)(6); Declaration of Kathleen Hopkins ("Hopkins Decl.") These regulations also required installation of handrails, toe boards, a swinging gate, or ladder offset to protect the unwary from the ladder shaft extending into the basement. 29 CFR 1910.23; Hopkins Decl.

23. The *Lookout Rules and Regulations* published by the USPS, and in effect on February 13, 1991, required the presence of cleaning lights in the lookout galleries of the Midtown Station. PX 5; Hopkins Decl.

24. After giving Mr. Battista and Mr. Russo access to the lookout gallery through the first floor doorway, Mr. Smith proceeded down the fixed ladder in the shaftway behind the door to the basement of Midtown Station and opened the door from the shaftway to

the basement. After he went into the basement, he left the door open one foot. Smith Decl. ¶ 19.

25. Mr. Battista and his partner each had a light stick which they used while working at Midtown station. Tr. 20.

26. Mr. Battista and his partner retrieved one light stick from a N.Y. Telephone toolbox that they kept outside of the Midtown Station before going to the lookout gallery. Tr. 22.

27. The light stick retrieved by Mr. Battista for use in the lookout gallery was approximately 2½ feet long and contained a single fluorescent bulb. The light stick had an extension cord that was 40 feet long. Tr. 22–24.

28. Mr. Battista descended the fixed ladder to the right of the doorway opening holding the light stick in his hand. Tr. 25, 46–47.

29. Mr. Battista stepped off to the side of the fixed ladder onto the floor of the lookout gallery. Tr. 28–29.

30. The light stick illuminated the area where Mr. Battista got off the ladder. Tr. 28, 54–55. The ladder shaft continuing to the basement is not, however, obvious to a person either descending or ascending the fixed ladder or standing beside the fixed ladder on the landing, even if that person is carrying a fluorescent light stick of the type used by Mr. Battista. *Id.; see also,* Russo Aff.; *infra* at 723 (discussing Court's independent examination of the lookout gallery in issue).

31. Mr. Battista then held the light stick to assist Mr. Russo to safely descend the ladder. Mr. Battista watched Mr. Russo as he descended the ladder. Tr. 31–32, 341.

32. Mr. Russo stepped off to the left side of the fixed ladder where Mr. Battista was standing onto the lookout gallery floor. Tr. 32, 342.

33. Mr. Battista and Mr. Russo then walked into the lookout gallery to inspect the area in which they were to lay cable. Tr. 32–33.

34. After working for several minutes, Mr. Battista decided that Mr. Russo should leave the lookout gallery to work on the opposite side of the wall. Mr. Battista then accompanied Mr. Russo back to the ladder carrying the light stick. Tr. 56.

35. Mr. Battista held the light stick to provide light for Mr. Russo to proceed safely up the ladder. Mr. Battista observed Mr. Russo pull himself onto the ladder from the left and climb up. Mr. Battista remained at the edge of the gallery by the ladder with the light stick for 10–15 seconds. Tr. 33–34, 60, 345.

36. After assisting Mr. Russo, Mr. Battista proceeded back to the area where he and Mr. Russo were working to continue the cable splicing work for approximately 20 minutes. Tr. 35.

37. After completing his work in the gallery, Mr. Battista walked to the fixed ladder to exit the lookout gallery carrying the light stick in one hand and a hammer and screwdriver in his other hand Tr. 63.

38. No safety chain, ladder offset, or other warning device was present to alert Mr. Battista that the ladder shaft continued to the basement.

39. The door to the shaft on the first floor was open at this time. Violanti Decl. ¶ 6. The door at the bottom of the shaft in the basement was also open approximately one foot. Smith Decl. ¶ 19.

40. Mr. Battista did not see the continuation of the ladder shaft, and fell from the gallery level to the basement floor. Tr. 37.

41. When discovered by Mr. Smith, Mr. Battista was lying facing the ladder, with his left knee tangled in the bottom rung of the ladder. Tr. 37.

42. Shortly after the accident, Mr. Battista told Joseph Pessolano, the emergency medical services technician, that he slipped and fell off of a ladder. Pessolano Decl. ¶ 4; PX–11.

43. Shortly after the accident, Mr. Battista also told William Loweth, the USPS employee who investigated the accident, that he slipped off the ladder. According to Loweth's report, prepared the day of the accident, Mr. Battista "slipped off the ladder and

fell to the base of the ladder." PX–2 (Narrative Description of the Accident).

## DISCUSSION

### Liability

1. As noted, this personal injury action is brought under the FTCA, which provides in relevant part:

> [T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

2. The substantive law that governs this action is that of New York State, which is "the place where the act or omission occurred." 28 U.S.C. § 1346(b). *Hatahley v. United States,* 351 U.S. 173, 182, 76 S.Ct. 745, 752, 100 L.Ed. 1065 (1956); *see Goodkin v. United States,* 773 F.2d 19 (2d Cir.1985).

■ 3. To make out a case of negligence against the Government, plaintiffs have the burden of proving that: (i) the

Government had a duty to him, (ii) the Government breached that duty, and (iii) as a result of that breach, plaintiff Mr. Battista suffered an injury. *Akins v. Glens Falls City School Dist.,* 53 N.Y.2d 325, 441 N.Y.S.2d 644, 648, 424 N.E.2d 531, 535 (1981); *Iannelli v. Powers,* 114 A.D.2d 157, 498 N.Y.S.2d 377, 380 (2d Dep't 1986).[2]

■ 4. To establish liability plaintiffs must show that the Government's alleged wrongful conduct was the proximate cause of Mr. Battista's injury. *See O'Toole v. Greenberg,* 64 N.Y.2d 427, 488 N.Y.S.2d 143, 145, 477 N.E.2d 445, 447 (1985). Such a showing requires proof that the Government created a continuous force active up to the time of the event that caused the injury. *Mack v. Altmans Stage Lighting Co., Inc.,* 98 A.D.2d 468, 470 N.Y.S.2d 664, 666–67 (2d Dep't 1984).

■ 5. We find that the negligence alleged by the plaintiffs that (1) there was no gate or railing at the entrance to the lookout gallery; (2) the lookout gallery had inadequate lighting; and (3) that the Government failed to warn Mr. Battista of an unsafe condition was proven at trial and constituted the proximate cause of the accident. *Ordonez v. LIRR,* 112 A.D.2d 923, 492 N.Y.S.2d 442, 443 (2d Dep't 1985); *Wagshall v. Wagshall,* 148 A.D.2d 445, 538 N.Y.S.2d 597, 598–

2. As a threshold matter, we reject plaintiff's alternative theory of liability, founded on the Government's alleged violation of New York Labor Law § 240(1) (McKinney 1986). It is well settled that this statutory provision does not apply to the work performed by plaintiff here, namely, the splicing of telephone cables and picking up new phone lines in a building—particularly where no Government employee requested or directed the work. *Cosentino v. LIRR,* 201 A.D.2d 528, 607 N.Y.S.2d 720 (2d Dep't 1994); *see also Giambalvo v. Nat'l R.R. Passenger Corp.,* 850 F.Supp. 166, 168–70 (E.D.N.Y.1994); *Manente v. Ropost, Inc.,* 136 A.D.2d 681, 524 N.Y.S.2d 96 (2d Dep't 1988); *Edwards v. Twenty–Four Twenty–Six Main Street Assocs.,* 195 A.D.2d 592, 601 N.Y.S.2d 11, 12–13 (2d Dep't 1993); *Kesselbach v. Liberty Haulage, Inc.,* 182 A.D.2d 741, 582 N.Y.S.2d 739 (2d Dep't 1992). Moreover, even if New York Labor Law § 240(1) applied to the facts of this case, we are prohibited from applying this provision against the United States. The FTCA's waiver of sovereign immunity is limited to negligent or wrongful acts or omissions of government employees and does not extend to claims

based upon liability without fault. *Laird v. Nelms,* 406 U.S. 797, 803, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972); *Dalehite v. United States,* 346 U.S. 15, 44–45, 73 S.Ct. 956, 972, 97 L.Ed. 1427 (1953); *Berghoff v. United States,* 737 F.Supp. 199, 203 (S.D.N.Y.1989). Section 240 of New York's Labor Law confers non-delegable duties upon landowners to provide safety devices and imposes liability without fault for failure of the safety devices. *Berghoff,* 737 F.Supp. at 203, 204; *see also Bland v. Manocherian,* 66 N.Y.2d 452, 497 N.Y.S.2d 880, 882, 488 N.E.2d 810, 811 (1985). Accordingly, because Section 240 of New York's Labor Law imposes liability without fault, the United States has not waived its immunity to suit for liability imposed under those statutes. *Berghoff,* 737 F.Supp. at 203–04, *Moody v. United States,* 753 F.Supp. 1042, 1048 n. 9 (N.D.N.Y.1990). Nor, finally, can strict liability be imposed for the United States' actions as a landowner. *Laird v. Nelms,* 406 U.S. 797, 803, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972). For the foregoing reasons, plaintiff's theory of liability under New York Labor Law § 240 fails.

99 (2d Dep't), *appeal dismissed in part and denied in part,* 74 N.Y.2d 781, 545 N.Y.S.2d 101, 543 N.E.2d 744 (1989); *Ascher v. F. Garafolo Elec. Co., Inc.,* 113 A.D.2d 728, 493 N.Y.S.2d 196, 197–98 (2d Dep't 1985), *aff'd,* 67 N.Y.2d 637, 499 N.Y.S.2d 681, 490 N.E.2d 548 (1986).

As noted, Mr. Battista testified that he was never notified of the continuation of the ladder shaft to the basement. In addition, Mr. Battista's partner, Mr. Russo, testified that he was never informed, nor otherwise became aware that the ladder extended down below the gallery level. Mr. Russo stated further that each time he needed to go from the gallery level to the basement, he would travel through the interior of the Post Office. This choice strongly suggests ignorance of the direct route from the gallery level to the basement (i.e., via the ladder itself).

The testimony of the employees of the Post Office who held any degree of responsibility for the safety of the lookout gallery also supports a finding of negligence. First, Mr. Violanti, Operations Manager for the Midtown Station, testified that despite his position of responsibility for safety conditions throughout the Post Office, he was not aware of the hazard posed by the ladder extending between the gallery level and the basement. *See* ¶ 21, *supra.* Second, Mr. Smith, Superintendent of the Midtown Station, testified that the lookout gallery in question at one time had lights, but those lights burned out seven or eight years ago. *See* ¶ 19, *supra.* He admitted, moreover, that he had failed to replace the lights even though it was his duty to do so. *Id.* We find the foregoing to be significant evidence of the Government's negligence in maintaining the safety of the lookout gallery.

The testimony of the parties' experts further indicates that the Post Office negligently permitted a hazardous condition to persist in the lookout gallery where Mr. Battista was at work. Ms. Hopkins, plaintiffs' expert, testified credibly that the ladder and shaft failed to comply with OSHA standards. As set forth *supra* at 719, the absence of lighting in the shaft or on the landing directly violates 29 CFR 1910.37(q)(6). Ms. Hopkins testified further that defendant's failure to install handrails, toe boards, a swinging gate, or ladder offset to protect the unwary from the ladder shaft extending into the basement violates 29 CFR 1910.23. The Post Office's own *Lookout Rules and Regulations,* referred to by Ms. Hopkins in her testimony, require the presence of cleaning lights in the lookout galleries of Midtown Station.

The Government posits several theories of defense, none of which are persuasive. First, the Government avers that it breached no duty towards Mr. Battista regarding his use of the lookout gallery because the Government told Mr. Battista to be careful and to bring sufficient light. Second, the Government contends that, although Post Office employees did not specifically advise Mr. Battista that the ladder continued down to the basement floor, there is no duty on the part of a landowner to warn against a condition that is readily observable by the reasonable use of one's senses.[3] Finally, the Government argues that defendant's negligence could not have been the proximate cause of the accident because Mr. Battista successfully remounted the ladder, thus attenuating any connection between the allegedly defective condition (i.e., failure to maintain a safety gate or other device to warn of the continuation of the ladder shaft) and the accident itself.

We find that the Government *did* have a duty to warn plaintiff of the continuation of the ladder shaft into the basement, and that the statement by Mr. Smith to Mr. Battista that he should be careful and bring adequate light failed to discharge that duty. The Post Office's Lookout Gallery Procedures identify the lookout galleries as hazardous places. This, and the additional hazard of an unmarked ladder shaft in a particular lookout gallery which is entirely unlighted, require a more substantial warning than that given to plaintiff.

We disagree, moreover, with the Government's assertion that the hazard of the ladder shaft was readily observable by the rea-

---

**3.** Gov't Proposed Findings of Law, citing *Olsen v. State of New York,* 30 A.D.2d 759, 291 N.Y.S.2d 833 (4th Dep't 1968), *aff'd* 25 N.Y.2d 665, 306 N.Y.S.2d 474, 254 N.E.2d 774 (1969).

sonable use of Mr. Battista's senses along with the lighting stick he brought into the Spy Gallery. Not only did Mr. Battista and Mr. Russo testify that they did not see the ladder shaft continue to the basement, the Court inspected the premises at the request and in the presence of the parties, and found that the lighting sticks used by plaintiff did not render the continuation of ladder shaft to the basement readily observable. Reasonable care demanded that the Government place permanent lighting, as required by both OSHA and the Post Office's own regulations, to illuminate the shaft.

Finally, we find unconvincing the Government's position that, because Mr. Battista allegedly fell facing the ladder, he must have slipped off the ladder while climbing it and, thus, must be found to have contributed to the accident. More precisely, the Government contends that, if plaintiff fell while climbing the ladder, any hazard created or duty breached by the Government could not have served as "a continuous force active up to the time of the harm"[4] and plaintiff, therefore, fails in his " 'burden to show that defendant's conduct was the substantial causative factor in the sequence of events that led to [his] injury.' "[5] We disagree. The Government relies on the following testimony of its expert Dr. Jolanda Janczewski:

> Based on the fact that the distance from the lookout gallery to the basement is only about six feet, I have calculated that it would have taken Mr. Battista less than .4 of a second to fall from the lookout gallery to the basement floor. Less than .4 of a second is insufficient time for Mr. Battista to twist in the air during his fall. In other words, Mr. Battista's position at the time of his landing was driven by his position at the time of his fall. Therefore, it is my opinion that Mr. Battista was climbing, and therefore facing, the ladder at the time of his fall.

Janczewski ¶ 25; Gov't Mem. at 12. The Government also emphasizes plaintiff's testi-

mony that he fell 10–15 feet to the basement floor, a distance that would have placed him on the ladder above the gallery level. Tr. 35.

With respect to the possibility that Mr. Battista twisted in the air while falling, plaintiff did not refute the testimony of defendant's expert and we find no reason not to credit Dr. Janczewski's assertion that plaintiff landed generally in the direction he was facing when he fell. Janczewski Decl. ¶ 25. We do not, however, adopt her conclusion—and that urged by the Government on the additional basis of plaintiff's testimony regarding the fall—that plaintiff was climbing the ladder when he fell. First, plaintiff's testimony regarding the actual fall was understandably somewhat vague, given the traumatic nature of the incident, and his estimation that he fell 10–15 feet is not one we find reasonable to hold him to as a scientifically accurate measurement.[6] Second, we do not agree that the only conclusion to be drawn from the factual finding that plaintiff fell facing in the general direction of the ladder is that he was climbing the ladder at the time. Plaintiff testified that he stepped off the ladder to the side. We find no reason to credit the Government's underlying assumption regarding his method of remounting the ladder, namely, that—if plaintiff was truly injured as a result of the continuation of the ladder shaft—the evidence would show that he attempted to stand directly in front of the ladder in order to remount it and, consequently, would have fallen facing the far wall of the spy gallery (i.e., the wall to the left of the ladder) as he attempted to position himself on what he believed to be solid ground. We note that plaintiff testified that he stepped off the ladder to the side. Even if, as plaintiff alleges, he believed that solid ground existed at what he regarded to be the base of the ladder (i.e., the ladder ended at the spy gallery level) it is not unreasonable to infer from the testimony that plaintiff stepped forward toward the ladder with his

---

4. *Mack v. Altmans Stage Lighting Co., Inc.*, 98 A.D.2d 468, 470 N.Y.S.2d 664, 667 (2d Dep't 1984).

5. *Koester v. State*, 90 A.D.2d 357, 457 N.Y.S.2d 655, 658 (4th Dep't 1982) (citations omitted).

6. Similarly, we place little weight on the exact wording of Mr. Battista's statements to those who came to his aid immediately after the accident, *see supra* at ¶¶ 42, 43, while he was in tremendous pain.

body in an at least slightly sideways position—in order to facilitate mounting the ladder—such that, when he fell, he landed "facing the ladder with [his] left leg entangled in one of the rungs of the ladder." Tr. 37 (cross examination of plaintiff). The fact that plaintiff stated that he "never got to the ladder," does not contradict such a version of events. In short, the testimony of Dr. Jancszewski and the Government's cross-examination of plaintiff is simply insufficient to refute plaintiff's contention that he was not climbing the ladder when he fell, but, rather, was attempting to remount it. Accordingly, we conclude that the Government breached its duty of reasonable care in maintaining the safety of the lookout gallery where Mr. Battista fell, and find the Government liable under plaintiff's theory of negligence for damages—discussed *infra* at 724–729—suffered by plaintiff as a result of his fall.

### Damages

■ 6. Plaintiffs have the burden of proving damages by a preponderance of credible evidence. *See Fleming v. American Export Isbrandtsen Lines, Inc.*, 451 F.2d 1329, 1333 (2d Cir.1971) (Moore, J., concurring in part and dissenting in part); *Candiano v. Moore–McCormack Lines, Inc.*, 251 F.Supp. 654, 660 (S.D.N.Y.1966), *aff'd*, 382 F.2d 961 (2d Cir. 1967), *cert. denied*, 390 U.S. 1027, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968).

■ 7. Plaintiffs' damages must be susceptible of ascertainment in a manner other than mere speculation. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

### Mr. Battista's employment subsequent to the accident

8. Mr. Battista was on disability leave from New York Telephone from February 13, 1991 to March 1, 1992. During 52 of the 54 weeks of this time period, Mr. Battista received disability payments from New York Telephone of his full salary of $763.00 per week. During the remaining 2 weeks Mr. Battista received $372.00 per week. Undisputed Fact No. 33.

9. Mr. Battista resumed working at New York Telephone in Manhattan on March 1, 1992 at a light duty position. At that time Mr. Battista's salary was $784.50 per week. Undisputed Fact No. 34.

10. From March 1, 1992 until he took a sabbatical from NYNEX, Mr. Battista received all increases in base pay given to cable-splicers after his injury, but he worked no overtime. Tr. 37–38.

11. Battista lost no fringe benefits, including pension plan rights, as a result of his fall. Nor did NYNEX lower his job grade. Tr. 37–38.

12. NYNEX overtime records reflect that Battista earned approximately 15% of his base pay in overtime in 1990. In 1991 and 1992 there was a decrease in the amount of overtime worked by or offered to cable splicers in Mr. Battista's group. Mr. Battista's overtime earnings would have amounted to 8.1% of his base pay in 1991, 7.3% of his base pay in 1992, and 10.3% of Battista's base pay in 1993 and 1994. PX–9; Declaration of Dr. Thomas K. Fitzgerald ¶¶ 13–17.

13. In September 1994, Mr. Battista took an Enhanced Educational Leave from NYNEX to fulfill the prerequisites for a doctorate in education. Tr. 39–40.

14. Mr. Battista is currently working as a teacher at the Children's Psychiatric Center. Tr. 39–40.

### Damages for Loss of Past Wages

■ 15. With regard to claims for economic damages, such as lost wages, a tortfeasor is required only to put the plaintiff "in the same economic position as he would have occupied had he not been injured." *McCrann v. United States Lines, Inc.*, 803 F.2d 771, 773 (2d Cir.1986).

■ 16. The parties agree that lost overtime is an appropriate measure of damages for the period in which Battista worked at NYNEX and that it is the only subset of damages for past wages that remains to be addressed by the Court. *See Stoker v. Tarentino*, 126 A.D.2d 815, 510 N.Y.S.2d 736, 737 (3d Dep't 1987) (overtime awarded in tort action if overtime is available and is distrib-

uted evenly by contract).[7] Plaintiffs specifically contend that they are entitled to lost past overtime · wages up to November · 29, 1994, which · their expert—economist Dr. Anna Dutka—estimated at trial to be $30,000. Declaration of Dr. Anna Dutka ("Dutka Decl.") at 2–4. We find, however, that this estimate must be significantly reduced. Plaintiff's expert based her estimate of past lost wages on incorrect amounts for Battista's base salary. *Compare* Dutka Decl. at 3 *with* Undisputed Fact Nos. 33–35; *see also* Tr. 172–76. This caused her estimate to overstate lost overtime income by approximately five percent. Tr. 176–78. In addition, Dr. Dutka overstated overtime earning by an additional 10–12% through mathematical errors. Tr. 178–83. Moreover, Dr. Dutka improperly estimated that lost overtime earnings would represent an invariable 15% of Battista's income. Dutka at 3. She based this estimate on calculations derived from Battista's 1990 W–2 form, without regard as to whether it included overtime paid in 1990 but worked in 1989. *Id.* Nor did she review NYNEX overtime records reflecting how much overtime was available and worked in 1991 and 1992, even though those documents were in the possession of plaintiffs' attorneys, Tr. 186; PX 9, and Dr. Dutka conceded on cross-examination that those records would be relevant to an estimate of lost overtime wages. Tr. 186.

By contrast, the Government's expert economist, Dr. Thomas K. Fitzgerald, estimated that Battista's overtime earnings would have amounted to 8.1% of Battista's base pay in 1991, 7.3% of Battista's base pay in 1992, and 10.3% of Battista's base pay in 1993 and 1994. Fitzgerald Decl. ¶¶ 15–17. Based on NYNEX overtime records, Dr. Fitzgerald compared Battista's propensity to use overtime to that of other cable splicers and multiplied the resulting ratio by the average number of overtime hours available in 1991–92. · *Id.* ¶¶ 14–17. For 1993–94 he took an average of Battista's use of overtime in 1990 and the estimates for 1991–92. *Id.* ¶ 18. Dr. Fitzgerald used accurate figures for Battista's base salary and deducted federal taxes from the estimate for past overtime. *Id.* ¶¶ 19, 21. In sum, we conclude that Dr. Fitzgerald's testimony is based on more reasoned assumptions and does not include either erroneous estimates for base salary or significant mistakes in calculation. *See Kossman v. Calumet Cty.*, 849 F.2d 1027, 1033–34 (7th Cir.1988) (appropriate to estimate overtime losses based on average amount worked by other employees). Dr. Fitzgerald also properly deducted federal taxes.[8] Accordingly, we rely upon Dr. Fitzgerald's calculations, Fitzgerald Decl. ¶ 23, and award plaintiff $12,593 for past overtime through December 1, 1994.

### Lost Future Overtime Wages

17. We find that, although an award for "[o]vertime is not appropriate in most cases since it is generally speculative whether the employee would have been entitled to it," [9] plaintiff here demonstrated a lost future wage claim—albeit a reduced one—that is "probable" and not based on "mere speculation." The testimony at trial revealed that overtime was made available at NYNEX throughout plaintiff's tenure and that he worked overtime with regularity throughout that tenure. *See* PX 9. No evidence was introduced to suggest that NYNEX had or has immediate ·plans to eliminate the availability of overtime—the Government's speculation that· such a change in corporate policy

---

7. The Court has amended the Pre-trial Order to allow plaintiffs to seek damages for past loss of base pay and payment of medical bills. Tr. 374. The parties have stipulated that the total amount of these damages is $49,909.29. PX 29.

8. Plaintiff's lost wages claim must be reduced by the amount of federal income taxes he would expect to pay because to provide a gross award of lost income would be contrary to the compensatory nature of the FTCA and would constitute punitive damages, and state law rules concerning taxes are thus irrelevant. *O'Connor v. United States*, 269 F.2d 578, 584–85 (2d Cir.1959); *Shaw v. United States*, 741 F.2d 1202, 1206 (9th Cir.1984); *Flannery v. United States*, 718 F.2d 108, 111 (4th Cir.1983) (citing cases), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984). *Barrett v. United States*, 660 F.Supp. 1291, 1318 (S.D.N.Y.1987).

9. *Stoker*, 510 N.Y.S.2d at 737; *see also Curtis v. Robern, Inc.*, 819 F.Supp. 451, 459 (E.D.Pa.1993) (claim for lost overtime rejected because of demonstrated decline ·in company's business).

*could* occur in the future is insufficient. Gov't Mem. at 31. In addition, plaintiff's testimony that he has changed careers rather than continue as an employee limited to light duty at NYNEX cannot be said to contradict his statement that, but for the injury, he would have continued to work—and work overtime—as a cable. splicer for NYNEX.[10]

■ As with plaintiff's estimate of lost past overtime, however, we are compelled, in calculating this measure of damages, to reduce significantly the amount demanded by plaintiff for lost future overtime in light of the credible and persuasive testimony of defendant's expert, Dr. Fitzgerald. Dr. Fitzgerald assumed that Battista would retire at the age of 59, which is the average retirement age of non-management employees at NYNEX. Fitzgerald Decl. ¶ 20; Declaration of Robert K. Donovan ("Donovan Decl.") ¶ 17; Tr. 266 (Donovan testifies that average is based on last 33,000 retirements at the company); *see also* Donovan ¶ 18 (Battista can retire at full pension). By contrast, plaintiff's expert, Dr. Dutka used the age of 65 on the assumption that "it seemed to have been an expressed intention," Tr. 192 despite plaintiff's failure to testify at trial concerning the age at which he intended to retire. As described above, Dr. Fitzgerald's estimates of how much overtime Battista would have worked are more accurate than Dr. Dutka's flat estimate of 15% because they are based on NYNEX's actual overtime records for a three year period rather than one year's W–2. *See Stoker v. Tarentino,* 126 A.D.2d 815, 510 N.Y.S.2d 736, 737 (3d Dep't 1987) (plaintiffs' claim for past overtime must be based on actual overtime records); Tr. 316–17 (Dr. Fitzgerald's testimony concerning Dr. Dutka's 15% estimate). Accordingly, the most reasonable measure of future overtime earnings is Dr. Fitzgerald's estimate of $19,638, which assumes a retirement age of 59, overtime earnings of 10.3% and includes a reduction for federal taxes and a reduction to present value employing a flat 2% discount rate;[11] Fitzgerald Decl. ¶ 23, therefore, we award plaintiff this sum as damages for loss of future wages.

### Worker's Compensation Payment for Non-economic Losses

■ 18. Plaintiffs argue that a $25,088 lump sum payment made to Battista as compensation for non-economic loss or for potential future lost earnings, which is subject to a lien by NYNEX,[12] is damages in this action. Tr. 373. We disagree. The lump sum award on its face overlaps with damages that plaintiffs seek in this action—an award for non-economic loss or for lost future wages. The Worker's Compensation Board gave Battista two forms of compensation at the end of its consideration of his case. First, it awarded $280 a week for a period of 21⅞ weeks for "protracted temporary disability." PX–13A. This award covered the period from March 2, 1992 until July 29, 1992. This award evidently is for non-economic loss because Battista was working for NYNEX during that period at full salary. *See* Undisputed Fact Nos. 33–34; Tr. 37–38. Second, the Worker's Compensation Board awarded $280 per week for the period between September 16, 1992 until January 6, 1994 for a "permanent partial disability." PX 13A. Again, we conclude

10. We similarly reject the Government's contention that plaintiff's weekend hobbies—skiing and participating in dog shows—belie his stated intention to work overtime into the future. Government Mem. at 31 (citing Tr. 44). There is no evidence that these activities prevented plaintiff from working overtime regularly during his employment as a cable splicer.

11. We note that any award for future pain and suffering or future lost income must be discounted so that "the time value of money [is] 'take[n] into account.'" *Oliveri v. Delta Steamship Lines, Inc.,* 849 F.2d 742, 751 (2d Cir.1988) (quoting *Metz v. United Technologies Corp.,* 754 F.2d 63, 68 n. 3 (2d Cir.1985)). This discounting is required to account for inflation and the ability to profit from current investment and must be applied to awards for lost future wages and for future pain and suffering. *DeChico v. Metro–North Commuter R.R.,* 758 F.2d 856, 859–60 (2d Cir.1985). In the Second Circuit, district courts may utilize a net discount rate of 2% based on the apparently stable relationship between inflation and interest rates. *Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 39–40 (2d Cir. 1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). Accordingly, we reduce all such awards set forth in this Opinion and Order by the foregoing standard discount rate.

12. The remaining funds subject to the NYNEX lien are discussed *supra* at n. 7.

that this award covered non-economic loss because Battista worked for NYNEX during this period at full salary. Tr. 37–38. *See also* PX 29 (parties stipulate that the lump sum award represents "additional compensation for the injury to his leg and for a protracted healing period"); Tr. 370 (plaintiffs concede award is compensation for pain and suffering). *Cf. Bellini v. Great American Indemnity Co.,* 299 N.Y. 399, 404, 87 N.E.2d 426 (1949) (schedule award for permanent partial disability "is not dependent on the number of weeks claimant was temporarily unable to work but on the extent of the permanent disability shown to have been sustained by the injured member.... When claimant has suffered such loss of a member he is entitled to a schedule award even though he suffers no loss of time or earning capacity by reason of the injury."); *Johnson v. Buffalo & Erie Cty. Private Indus. Council,* 84 N.Y.2d 13, 613 N.Y.S.2d 861, 864, 636 N.E.2d 1394, 1397 (1994) ("compensation for permanent partial disability or facial disfigurement *may* be deemed compensation in lieu of first-party benefits [under no-fault law] because it often relates to a claimant's basic economic loss, as in lost earnings, 'whether actual or presumed' ") (emphasis in original).

In light of the foregoing, we find no basis for treating this award as damages. The existence of this award, and NYNEX's lien stemming from the award, is not admissible under the New York collateral source rule. *See* N.Y.Civ.Prac.L. & R. § 4545(c) (McKinney 1992), which simply does not provide for the offensive use of liens and Worker's Compensation awards to drive up damages in a personal injury action. *Id.*

Plaintiffs have sought a judgment for non-economic damages and for future economic losses in this action; therefore, this Court can award the proper amount of damages for those claims. The fact that plaintiffs already have received monies for those losses is simply irrelevant. Thus, as we noted at trial, that portion of NYNEX's lien which reflects compensation for non-economic damages effectively functions as an advance to plaintiff and shall not be considered in awarding damages in this action. Tr. 380–81. *See* Fed. R.Evid. 401–403.

### Non-economic losses

#### A. Pain and Suffering

█ 19. Although there is no precise rule for determining damages for pain and suffering, a trier of fact is bound by a standard of reasonableness. *Paley v. Brust,* 21 A.D.2d 758, 250 N.Y.S.2d 356, 357 (1st Dep't 1964). It is our view, set forth in detail below, that the evidence presented at trial revealed that Mr. Battista's injuries, while more than minimal in the pain and suffering they have induced, have not resulted in overwhelming long term trauma to his physical and emotional life.

*Medical Treatment of Plaintiff's Injuries*

20. Ambulance personnel who attended to Mr. Battista at the scene of the accident noted that he sustained an injury to his left knee, with no gross deformity. PX–11. They noted no other injury to Mr. Battista. *Id.* According to the uncontradicted testimony of Dr. Edward S. Crane, as well as the medical records stipulated to by the parties, plaintiff was initially taken to St. Vincent's Hospital, where x-rays were taken but no full evaluation of the knee was done. Thereafter, Dr. Steven C. Hausman treated Mr. Battista, twice aspirating his knee in an unsuccessful effort to relieve the pressure on the inside of the joint. Conservative treatment of the injury failed, and Dr. Hausmann testified that he performed an arthroscopy, lysis of adhesions, chondroplasty, and excision of the medial plica. Tr. 273–74; PX 14. Plaintiff underwent physical therapy until he reached a plateau, Crane Aff., at which point he consulted Dr. Crane. Dr. Crane conducted an additional arthroscopy, although he did not perform any reparative surgery at that time. Tr. 125–128. No further medical procedures were performed, and plaintiff underwent physical therapy until early 1993.

#### Consequences of Plaintiff's Injury

█ 21. In our view, the evidence supports a finding that Mr. Battista has suffered articular cartilage changes in his left knee as a result of the accident, and that these changes reflect that he is suffering from at

least a mild case of arthritis in that joint. Plaintiffs' expert, Dr. Crane, testified both that he found moderate grade arthritis of a permanent nature in the left knee and that the arthritis had resulted from the articular changes brought about by the trauma of the accident. Defendant's expert, Dr. David Weiss, could provide no clinical or otherwise reliable evidence that the foregoing condition is a degenerative one, unrelated to the accident—the mere observation that degenerative arthritis is "common" among persons of Mr. Battista's age is insufficient to support such a finding in the instant matter, particularly where the Government offered no conclusive evidence that Mr. Battista suffers from degenerative arthritis in his *right* knee.

The foregoing and other evidence, however, suggests that the ultimate effect on the daily life of Mr. Battista of the injury to his left knee, while significant, is not substantially debilitating. The evidence shows, for example, that Battista has suffered only a minimal loss, if any, in the range of motion of his left leg as a result of his injury. Dr. Hausmann's March 6, 1992 notes indicate that Battista had full range of motion of his leg on that date (PX 17), and Dr. Crane testified that when he examined Battista in 1992, he found only 2 degrees loss of extension and 5 degrees loss of flexion. Tr. 130. Dr. Crane further testified that as of November 18, 1994, Battista had full extension of his left leg and only 10 degrees loss of flexion. Tr. 124. Finally, Dr. Crane testified that a "7-degree difference" in range of motion "is not unusual from examiner to examiner and from day to day. So I don't think it is a major issue." Tr. 130. Dr. Crane's testimony concerning the insignificance of any deficit in the range of motion of Battista's left leg was corroborated by Dr. Weiss. As Dr. Weiss explained, under the American Medical Association's Guides to the Evaluation of Permanent Impairment, an authoritative medical treatise which sets forth percentages of impairment based on objective criteria, Battista has no impairment of his leg by reason of

any deficit in his range of motion. Weiss Decl. ¶¶ 16–17. Thus, with respect to range of motion, plaintiff has suffered little, if any, damage to the joint.[13]

The record supports, however, the finding that plaintiff suffers significant, though not crippling, pain as a result of the arthritic changes brought about by the injury to his knee. Dr. Crane testified that he believes that the arthritic changes he saw during Battista's arthroscopy was consistent with considerable pain, (Tr. 136–37), and plaintiff indicates that he suffers pain after extensive walking and can no longer ski—as he once did regularly. Tr. 39–40. Beyond these limitations, however, plaintiff has undeniably shown remarkable progress in regaining nearly full use of his left knee through physical therapy. The medical records show that Battista consistently reported to his physical therapist that he had decreasing pain and increased mobility (PX 23, 10/29/91 note, 10/30/91 note, 11/11/91 note, 12/4/91 note), and that by December of 1991, he was reporting only occasional soreness and aching. GX O (12/6/91 report). His progress continued through the spring of 1992. PX 23 (physical therapy 2/22/92 note) ("Ron Battista offers no additional complaints. Seems to be tolerating progressive exercise without difficulty."). On May 26, 1992, Battista's "major problem" was leg fatigue without pain after walking a half block which resolved with rest. GX M (Dr. Crane's 5/26/92 note). By September 8, 1992, Battista reported to his physical therapist that he could walk two miles without difficulty. PX 23 (9/8/92 note). Battista has not taken any physical therapy since early 1993. Tr. 44. In sum, the evidence establishes that an award of $125,000 is sufficient to remunerate Mr. Battista for the non-economic losses flowing from the injury to his left knee. *See, e.g., Linscombe v. Wal–Mart Stores, Inc.,* 1993 WL 631570 (E.D.Tx.1993) (jury awarded $125,500 to plaintiff who suffered a sprain of the medial collateral ligament of the left knee as a result of tripping and falling on a defect in the

---

**13.** It is undisputed that Mr. Battista also suffered a tear of the medial collateral ligament as a result of the accident. Defendant's expert, Dr. Weiss, testified that this injury healed—albeit with the growth of scar tissue rather than regen-

eration of the ligament itself—without surgery. Weiss ¶ 10; Tr. 304. Plaintiff submitted no evidence that this injury has manifested itself in any physical limitations on Mr. Battista.

parking lot of defendant retail store); *Cuffee v. Short,* 1994 WL 373281 (E.D.Va.1993) (jury awarded $155,000 to plaintiff who suffered 9% permanent disability and arthritis in the knees as a result of an automobile accident); *Schwartz v. Gardner,* 1992 WL 520862 (E.D.Pa.1992) (parties reached settlement in the amount of $185,000 where plaintiff suffered a tear of the medial collateral ligament, a partial detachment of the left patella, and anxiety disorder allegedly as a result of being struck by defendant's automobile); *Keeley v. National Railroad Passenger Corp.,* 1991 WL 488013 (S.D.N.Y.1991) (jury awarded $74,650 to 30 year old plaintiff who suffered torn anterior cruciate ligament after falling into 10 foot pit created by defendant contractor).

### B. Loss of Consortium

■ 22. Plaintiff Arlene Battista seeks recovery for loss of consortium. This claim "embraces such elements as love, companionship, affection, society, sexual relations, solace and more." *Millington v. Southeastern Elevator Company,* 22 N.Y.2d 498, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897, 899 (1968). The cause of action essentially seeks to compensate the interest of the injured party's spouse in "the continuance of a healthy and happy married life." *Id.* 293 N.Y.S.2d at 310, 239 N.E.2d at 900. Neither Mrs. nor Mr. Battista testified that their love and affection for each other had diminished after the accident. *Id.,* Tr. 44. Furthermore, Mrs. Battista's testimony makes clear that her damages derive solely from caring for her husband in the first four months after his accident. *See* A. Battista at 2–3. We must also limit any award of damages for Arlene Battista's claim for loss of consortium given that the Battistas did not expend any money to have household chores performed. *Id.* We find that an appropriate award for loss of consortium is $10,000.

### CONCLUSION

For the foregoing reasons, we find the Government liable under a theory of negligence for the following damages suffered by plaintiffs as a result of plaintiff Ronald Battista's injury incurred at the Midtown Post Office on February 13, 1991. Plaintiffs are awarded $12,593 to compensate for the lost past overtime wages of Ronald Battista; $19,638 to compensate for the lost future overtime wages of Ronald Battista; $29,033.29 to compensate for the medical expenses of Ronald Battista [14]; $20,876 to compensate for the lost past base wages of Ronald Battista [15]; $125,000 to compensate Ronald Battista for non-economic losses including pain and suffering; and $10,000 to compensate Arlene Battista for loss of consortium. The parties are hereby ordered to settle a judgment reflecting the damage awards set forth in this Opinion and Order, and the Clerk of the Court shall enter such judgment.

SO ORDERED.

---

14. As noted, this sum is subject to the NYNEX lien.

15. This award is also subject to the NYNEX lien.