# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-20435

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2015

Lyle W. Cayce
Clerk

MARTIN OPERATING PARTNERSHIP, L.P.,

      Plaintiff - Appellant

v.

UNITED STATES OF AMERICA; UNITED STATES COAST GUARD,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:12-CV-3483

Before HIGGINBOTHAM, DAVIS, and SOUTHWICK, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:*

      Plaintiff-Appellant Martin Operating Partnership, L.P. ("Martin") appeals from the district court's final judgment dismissing Martin's claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), and the Suits in Admiralty Act (SIAA), 46 U.S.C. § 30901 *et seq*., against Defendants-Appellees the United States of America and the United States Coast Guard (collectively, the "Coast Guard") under Federal Rules of Civil Procedure

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-20435

12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction based on the discretionary function exception to both statutes. Martin also appeals from the district court's discovery order permitting the government to withhold certain documents under the deliberative process privilege. We affirm.

## I.     Background

Martin owns a tank-barge vessel, the PONCIANA (the "Vessel"), which must obtain a Certificate of Inspection every five years from the United States to continue operating in U.S. waters.  The Vessel's Certificate of Inspection was set to expire on March 7, 2011, so it would require an inspection around that time. In early October of 2010, approximately five months prior to the scheduled certification inspection, Martin reportedly hand-delivered to the Coast Guard a package with information on both the Vessel and a gas-free operation that Martin planned on performing at the shipyard before the inspection.  The gas-free operation was intended to purge the Vessel's tanks of any residual cargo, in this case iso-butane gas, using a portable vapor destruction unit (flare system) made by John Zink Company.

In early October of 2010, a Coast Guard representative sent a letter to Martin, explaining that he had examined the packet but needed more information on the proposed gas-free operation. Martin replied in mid-October, explaining that it was prudent to flare off the gas before the inspection in case "hot work" was needed based on the inspections, and in case Martin decided to seek a re-rating of the tanks for a higher capacity. Martin's letter did not explain any more details concerning the procedure other than its purpose.

Without receiving either an approval or objection from the Coast Guard, Martin proceeded to get approval for the gas-free operation from the Florida Environmental Protection Commission ("EPC") in dry dock at International Ship Repair ("ISR"), a third-party company. This information

2

was forwarded to the Coast Guard. In January of 2011, Martin advised the Coast Guard that the Vessel would arrive in Tampa, Florida, on March 2, 2011, to conduct the gas-free operation at ISR's facility.  On March 1, as the Vessel traveled from the Philadelphia area toward Tampa, the Coast Guard requested proof of the EPC's approval for the gas-free operation, which Martin then forwarded to the Coast Guard. On March 2, 2011, the Coast Guard informed Martin for the first time that it objected to the gas-free operation.

The Coast Guard objected on March 2 pursuant to 33 C.F.R. § 154, which applies generally to "each facility that is capable of transferring oil or hazardous materials, in bulk, to or from a vessel."[1] Both Martin and Ted Humphreys of ISR corresponded with the Coast Guard, sending additional information on the gas-free operation.

On March 3, 2011, the Coast Guard emailed Humphreys stating that the gas-free operation must take place at a facility approved under 33 C.F.R. § 127, which generally governs cargo transfers for waterfront facilities handling liquefied natural gas and liquefied hazardous gas, and Humphreys forwarded the email to Martin. Martin corresponded with the Coast Guard, attempting to convince it that § 127 did not apply because the tank-cleaning operation did not qualify as a cargo transfer, seeking written reasons for the objection, and requesting (without success) a meeting with the Coast Guard Captain of the Port ("COTP") to discuss the objections.

To comply with the Coast Guard's requirement that the gas-free operation take place at a facility certified under § 127, Martin decided to perform the operation at a certified facility owned by Sea-3 of Florida, Inc., with the approval of the EPC. On March 4, the operations superintendent of

---

[1] 33 C.F.R. § 154.100.

No. 14-20435

the Tampa Port Authority notified a number of people, including Coast Guard personnel, that Martin planned to carry out the gas-free operation either on March 4 or 5 at Sea-3; the email noted that "LCDR Whidbee of the USCG is also aware of it and will be recommending approval to CAPT Dickinson [of the Coast Guard]."

Coast Guard COTP Sharon Dickinson did not, in fact, approve the operation. Instead, on Friday, March 4, she issued Order 11-010, which provided, in relevant part:

> I have received a request to transfer Liquefied Hazardous Gas (LHG) from Martin Marine Tank Barge PONCIANA to [Sea-3] using the John Zink Gas Flare System ("the system"). After careful review of the applicable regulations and the documentation provided I have determined that the proposed transfer does not meet the requirements of 33 CFR 127, Subparts A and C. The applicable regulations provide for design, construction and operation requirements to ensure the safe transfer of LHG to and from vessels. The system proposed to be used for the transfer of the product from the Tank Barge PONCIANA does not comply with the requirements of 33 CFR 127, and as such, poses a hazard to the vessel, the facility, the port, and the surrounding waterway. I cannot determine through the documentation and proposal that has been presented that the operation can be completed without presenting an unsafe operating condition. Therefore, under the authority of the <u>Ports and Waterways Safety Act</u>, 33 USC 1221, et seq., I hereby issue the following Order:
>
> **1. Transfer of Isobutane from the Martin Marine Tank Barge PONCIANA to Sea 3 using the John Zink Gas Flare System for the purpose of flaring and purging the barge is prohibited.**

4

No. 14-20435

Although the Order was directed to Martin, Martin claims it never received the Order until Monday, March 7. Kevin Wertman of Sea-3 began corresponding with the Coast Guard, seeking to obtain approval to perform the gas-free operation. He provided the Coast Guard with more information on the operation and the John Zink flare system.

On March 8, Wertman sent an email to Martin saying that he had spoken with the Coast Guard, and the Coast Guard had referenced Navigation and Vessel Inspection Circular ("NVIC") 1-96 and 33 C.F.R. § 154.806, with no mention of 33 C.F.R. § 127. NVIC 1-96 provides "recommended safety standards for the design and operation of a marine VCS [Vapor Control System] at tank barge cleaning facilities,"[2] while 33 C.F.R. § 154.806, at the time, related to VCS certification.[3] Martin asserts the Coast Guard later agreed that NVIC 1-96 also did not apply.

On March 9, Lieutenant Commander Andre Whidbee of the Coast Guard emailed Wertman and let him know that he and his boss had just talked to Coast Guard headquarters in Washington, DC, and "believe we have identified the way ahead but are waiting for their official word so we can start moving forward on this" by the end of the day. In the meantime, to avoid any further problems with the Order, Martin opted to move the Vessel to Houston to perform the gas-free operation there.

On March 11, 2011, after additional review, the Coast Guard rescinded Order 11-010, clearing the way for the gas-free operation to proceed. On March 25, after the order was rescinded, Captain Dickinson conceded that the Coast Guard's initial determination that 33 C.F.R. § 127 applied was based on mistaken facts, but she explained that, at the time, because the

---

[2] *See* https://www.uscg.mil/hq/cg5/nvic/pdf/1996/n1-96.pdf.

[3] 33 C.F.R. § 154.806 (2011). Section 154.806 was removed as part of comprehensive revisions to the VCS regulations in a final rule effective August 15, 2013. *See* Marine Vapor Control Systems, 78 Fed. Reg. 42596-01.

No. 14-20435

John Zink flare system had not been certified for use in a marine environment, she "felt it was necessary to exercise my Captain of the Port Authority to prevent damage to the port in accordance with 33 CFR 160.109," applicable to operations involving hazardous materials. In her opinion, "With the safety of the marine environment as my mandate, I determined that requiring a certification by a Coast Guard approved certifying entity would be the most prudent action to allow the operation to proceed."

On April 21, Martin filed a formal administrative appeal of Captain Dickinson's "decision to not allow Martin . . . to perform a flaring operation of the [Vessel] . . . beginning Friday March 4, 2011," i.e., Order 11-010, seeking a retraction of the Coast Guard's decisions and monetary redress. Captain Dickinson denied Martin's appeal on May 6, 2011, noting that she had "based my decision on the authority contained in 33 CFR 160.109" and explaining that Martin could administratively appeal her denial. Martin did so.

On October 12, 2012, Rear Admiral Baumgartner denied the appeal, explaining that Order 11-010 had already been rescinded on March 11, 2011, and that the Vessel had already departed from the port on the date it was rescinded; accordingly, Rear Admiral Baumgartner concluded that the appeal "is moot, and no action will be taken on your appeal." He agreed that "certification of the flare system is not required and is not necessarily the most salient safety factor for the flaring operation." Accordingly, he concluded that "District Seven and Sector St. Petersburg will not consider your client's use of a mobile VDU [Vapor Destruction Unit] to gas free barges containing liquefied hazardous gas (LHG) cargo residue at waterfront facilities not designed as a facility handling LHG pursuant to 33 C.F.R. Part 127 as per se unsafe."

However, he cautioned that "[p]ursuant to the Coast Guard's authority under the Ports and Waterways Safety Act (33 U.S.C. § 1221, *et seq*.), and

6

implementing regulations codified at 33 C.F.R. Part 160, the COTP retains the responsibility to ensure the maritime safety and security of the waterfront facility, the waterway, and the port." Thus, the Coast Guard would still require Martin to submit information detailing the procedure in the future, which the Coast Guard would review on a case-by-case basis "to ensure the safety of the flaring operation. The COTP retains the discretionary authority to halt or prohibit any operation that adversely impacts the safety of the waterfront facility, the waterway, or the port."

Martin received a final administrative denial on May 30, 2012, and filed this lawsuit seeking $440,548 in actual damages. The Coast Guard filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction. It also asserted the deliberative process privilege with respect to a number of documents pursuant to 5 U.S.C. § 552(b)(5). As noted, the district court reviewed the documents *in camera* and determined which documents or portions of documents were protected by the privilege, ordering disclosure of the non-privileged portions. Eventually the district court granted the motion to dismiss based on the discretionary function exception to the FTCA and SIAA, expressly declining to address the private party analogue issue, dismissing the suit with prejudice. This appeal followed the district court's denial of Martin's motion for a new trial.

## II.    Applicable Law

The bulk of this appeal concerns the district court's dismissal for lack of subject matter jurisdiction under Rule 12(b)(1), which we review de novo.[4]

---

[4] *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009) (citing *St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009)).

No. 14-20435

## A.     The FTCA/SIAA Discretionary Function Exception

The FTCA waives sovereign immunity under limited circumstances and permits, under 28 U.S.C. § 1346(b)(1), suits against the United States

> for money damages . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred[.][5]

Among several exceptions to this waiver of sovereign immunity is the discretionary function exception found in 28 U.S.C. § 2680(a), which exempts from liability:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.[6]

The SIAA, 46 U.S.C. §§ 30901 *et seq*.,[7] waives sovereign immunity with respect to certain admiralty claims, providing, in relevant part:

> In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam

---

[5] 28 U.S.C. § 1346(b)(1); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 535 (1988).

[6] 28 U.S.C. § 2680(a).

[7] The SIAA was formerly found at 46 U.S.C. § 791 *et seq*.

8

No. 14-20435

> may be brought against the United States or a
> federally-owned corporation.[8]

Although the SIAA was enacted before the FTCA, courts have read into the SIAA the same discretionary function exception found in § 2680(a).[9]

"The discretionary function exception, embodied in the second clause of § 2680(a), marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."[10] To determine whether a governmental actor's conduct qualifies as a discretionary function, we must apply the Supreme Court's two-part test.

"First, the court considers whether the challenged conduct involved 'an element of judgment or choice.'"[11] This first prong cannot be met if a federal statute, regulation, or policy mandates a particular course of action "because the employee has 'no rightful option but to adhere to the directive.'"[12] The mere presence of mandatory language in a statute, regulation, or policy is not dispositive, however, if room for discretion remains, and that discretion includes the actions at issue.[13] The first prong is met if the applicable law

---

[8] 46 U.S.C. § 30903(a).

[9] *See Wiggins v. U.S. Through Dep't of Army*, 799 F.2d 962, 964 (5th Cir. 1986).

[10] *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 808 (1984).

[11] *MS Tabea Schiffahrtsgesellschaft MBH & Co. KG v. Bd. of Comm'rs of Port of New Orleans* (*MS Tabea*), 636 F.3d 161, 165 (5th Cir. 2011) (quoting *United States v. Gaubert*, 499 U.S. 315 (1991)).

[12] *Id.* (quoting *Gaubert*, 499 U.S. at 322).

[13] *See Davis v. United States*, 597 F.3d 646, 650 (5th Cir. 2009) ("The Davis family identifies some mandatory language in the Navy's Search and Rescue Manual. Importantly, though, the manual's preface provides that a 'rescue environment may require deviation from procedures contained herein. Deviation from specified rescue procedures is authorized in emergency situations when safety justifies such a deviation.' Hurricane Katrina presented the sort of emergency situation justifying a deviation from the manual's provisions. The acts of alleged negligence were discretionary decisions made by the rescuers.").

No. 14-20435

"leaves it to a federal agency or employee to determine when and how to take action."[14]

> Second, the court considers whether the judgment at issue is the kind the discretionary function exception was designed to protect, that is, whether it is grounded in social, economic, or public policy. When a statute, regulation, or agency guideline allows a Government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." In light of this presumption, to survive a motion to dismiss based on the discretionary function exception, a complaint "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." In determining whether the exception bars a suit against the Government, our focus is on the nature of the action taken and whether that action is susceptible to policy analysis.[15]

As the Supreme Court explained in *Varig Airlines*, "whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals."[16] The "underlying basis" for the exception is that "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort" in order "to protect the Government from liability that would seriously handicap efficient government operations."[17]

"The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature

---

[14] *MS Tabea*, 636 F.3d at 166 (citing *Gaubert*).

[15] *Id.* (citations to *Gaubert* and *Varig Airlines* omitted).

[16] *Varig Airlines*, 467 U.S. at 813-14 (footnote omitted).

[17] *Id.* at 814 (citation and internal quotation marks omitted).

No. 14-20435

of the actions taken and on whether they are susceptible to policy analysis."[18]
As the District of Columbia Circuit has summarized:

> The Supreme Court has emphasized, however, that the issue is not the decision as such, but whether the "nature" of the decision implicates policy analysis. What matters is not what the decisionmaker was thinking, but whether the type of decision being challenged is grounded in social, economic, or political policy. Evidence of the actual decision may be helpful in understanding whether the "nature" of the decision implicated policy judgments, but the applicability of the exemption does not turn on whether the challenged decision involved such judgments.[19]

Because the focus is on the type of decision and not how it was actually made, it is irrelevant whether the decisionmaker was negligent, abused his or her discretion, or even failed to exercise discretion at all.[20] Those issues go to the merits of the case, if the claimant can overcome the discretionary function exception.

## B.    The Coast Guard's Regulatory Authority

The parties agree that the source of the Coast Guard's authority in this case is the Ports and Waterways Safety Act (PWSA), 33 U.S.C. § 1221 *et seq.*, specifically the broad grant of discretion in the interest of safety in 33 U.S.C.

---

[18] *Gaubert*, 499 U.S. at 325. *See also Spotts v. United States*, 613 F.3d 559, 573 (5th Cir. 2010) ("Whatever Maldonado's actual decisionmaking process, it is clear that the health, safety, financial, and other feasibility concerns implicated by the evacuation decision render that decision susceptible to policy analysis."); *Demery v. U.S. Dep't of Interior*, 357 F.3d 830, 833 (8th Cir. 2004) ("The judgment or decision need only be susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account, for the exception to be triggered." (citing *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 801 (8th Cir. 1993)).

[19] *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) (citations omitted).

[20] *See* 107 Am. Jur. Proof of Facts 3d 241 §§ 23-24 (2009; Supp. Feb. 2015) (collecting cases); 28 U.S.C. § 2680(a) (providing that the exception applies "whether or not the discretion involved be abused").

§ 1223(b)(3), which authorizes the Secretary to "order any vessel . . . to operate or anchor in a manner he directs if," for any of various broad reasons, "he is satisfied that such directive is justified in the interest of safety."[21] Section 1223 is made subject to § 1224, which provides that, "[i]n carrying out his duties and responsibilities under section 1223 of this title, the Secretary shall . . . take into account all relevant factors concerning navigation and vessel safety, protection of the marine environment, and the safety and security of United States ports and waterways.[22] The statute lists nine non-exclusive factors, including "the scope and degree of the risk or hazard involved."[23] In addition, the Secretary is directed to, "at the earliest possible time, consult with and receive and consider the views of representatives of the maritime community, ports and harbor authorities or associations, environmental groups, and other parties who may be affected by the proposed actions."[24]

The Coast Guard has promulgated a number of regulations within the scope of this broad grant of discretion. Some of these, such as 33 C.F.R. Part 127 (covering the transfer of liquefied natural gas and liquefied hazardous gas) impose certain requirements for specific situations. Others apply more generally to the application of the PWSA, including 33 C.F.R. Part 160, concerning the control of vessel and facility operations under the PWSA. In these regulations, 33 C.F.R. § 160.109 provides authority to issue broad orders to protect bridges and other structures on or in navigable waters, adjacent structures, and the waters themselves "from harm resulting from vessel or structure damage, destruction, or loss."[25] Section 160.111 provides

---

[21] 33 U.S.C. § 1223(b)(3).
[22] 33 U.S.C. § 1224(a).
[23] *Id.*
[24] 33 U.S.C. § 1224(b).
[25] 33 C.F.R. § 160.109(a).

similarly broad authority to "order a vessel to operate or anchor in the manner directed" when, for example, "[t]he District Commander or Captain of the Port has determined that such order is justified in the interest of safety by reason of weather, visibility, sea conditions, temporary port congestion, other temporary hazardous circumstances, or the condition of the vessel."[26]

## III.  The Coast Guard's Actions Are Subject to the Discretionary Function Exception.

Given the broad statutory and regulatory scheme set out above, we must conclude that the Coast Guard's decisions in this case, which were premised on safety concerns, fell within the broad scope of the Coast Guard's discretion to issue orders in the interest of safety. The district court's decision was based primarily on its finding that the Coast Guard acted pursuant to the PWSA, and Martin concedes that the PWSA provides the Coast Guard discretion to issue safety orders. Nevertheless, Martin argues that the Coast Guard's actions in this case are not protected by the discretionary function exception for three reasons: (1) the Coast Guard failed to follow certain mandatory non-discretionary requirements to "activate" that authority and therefore is not protected by the discretionary function exception; (2) the Coast Guard did not act within its discretion because it incorrectly concluded certain regulations applied when in fact they did not; and (3) the Coast Guard's approximately five-month delay in objecting to Martin's plans fell outside the discretionary function. We conclude there is no merit to any of these arguments.

### A.  The Coast Guard Did Not Fail To Fulfill Any Mandatory, Non-Discretionary Acts.

Martin argues first that the Coast Guard failed to comply with mandatory, non-discretionary prerequisites to exercising its discretion, such

---

[26] 33 C.F.R. § 160.111.

that the discretionary function exception cannot apply. Specifically, Martin claims that although 33 U.S.C. § 1223(b)(3) grants the Coast Guard broad discretion, it cannot exercise that discretion unless it complies with 33 U.S.C. § 1224's mandatory requirement that it "shall" consider all the relevant listed factors and consider the views of others, including "other parties who may be affected by the proposed actions." Martin argues that only by carrying out § 1224's mandatory requirements may the Coast Guard "activate" its discretion under § 1223, and claims the Coast Guard presented no record evidence that it satisfied the supposedly mandatory requirements.

There are two problems with Martin's argument. First, mandatory language in a statute, regulation, or policy does not automatically remove all discretion.[27] Here, although § 1224 requires the Coast Guard to consider certain factors in arriving at a decision, it does not dictate how the Coast Guard must do so, leaving a great deal of discretion in how to carry out its decisionmaking and how to document that process, if at all.

Second, there is ample evidence in the record that the Coast Guard satisfied this duty. At the outset, the Coast Guard requested more information on the gas-free operation. Beginning March 1, the Coast Guard was in frequent contact with Martin and Martin's contacts at ISR and Sea-3 seeking relevant information on the operation so it could determine whether it was safe. Although the Coast Guard initially misinterpreted those facts, the record amply demonstrates that the Coast Guard satisfied its general duty under § 1224 to consider all relevant factors and seek input from affected parties.

Martin also argues, unpersuasively, that the Coast Guard violated mandates in its own internal procedures set out in the Coast Guard's Marine

---

[27] *See, e.g., Davis*, 597 F.3d at 650 (mandatory language in a manual did not remove discretion from actions at issue).

No. 14-20435

Safety Manual ("MSM") and Commandant Instruction 3500.3 ("COMDTINST").[28] Martin argues that these documents require Coast Guard personnel to perform an Operational Risk Management analysis before prohibiting any commercial marine activity, but it has pointed to no specific mandatory requirements in them that would apply to remove the Coast Guard's discretion in this case. To the contrary, the MSM explicitly retains discretion: "The MSM should be used as a guide for consistent and uniform administration of marine safety activities, without undue hampering of independent action and judgment by marine safety personnel."[29]

In short, Martin has failed to show that the Coast Guard violated any mandatory statutory or regulatory duty which might preclude application of the discretionary function exception.

## B. The Discretionary Function Exception Still Applies Even If the Coast Guard's Analysis Was Incorrect.

Next, Martin argues that the discretionary function cannot apply in this case because the Coast Guard applied an incorrect regulation based on its misunderstanding of the facts. Martin cites a single Supreme Court case, *Hatahley v. United States*, 351 U.S. 173 (1956), for the proposition that a federal agent acting under an inapplicable regulation operates outside his or her discretion; it cites no other binding authority. *Hatahley* is inapposite because it involved a decision that fell *outside* the federal agents' legal

---

[28] The COMDTINST, which is incorporated by reference into the MSM, "outlines procedures and responsibilities to implement" the standardized ORM policy but does not appear to be self-implementing. The document even notes that implementation will vary from unit to unit depending on resources, and that "smaller units are not expected to use these implementation methods as frequently or thoroughly as larger units having more resources."

[29] *See* MSM at 1-2 (available at http://www.uscg.mil/directives/cim/16000-16999/CIM_16000_6.pdf).

15

authority.[30] In this case, although the Coast Guard cited an inapplicable regulation based on a factual misunderstanding, its decision was unquestionably based on safety concerns and therefore remained well within the Coast Guard's broad discretionary authority under 33 U.S.C. § 1223(b)(3), as well as the broad regulatory authority set out in 33 C.F.R. Part 160.

Because the Coast Guard's decision is susceptible to social, economic, or public policy analysis, the discretionary function must apply even if the decision was incorrect. Indeed, the discretionary function would apply even if the Coast Guard had abused its discretion.[31] At worst, Martin has shown that the Coast Guard was overly cautious and misinterpreted the facts concerning the gas-free operation, which is insufficient to overcome the discretionary function exception.

### C. The Discretionary Function Exception Applies to the Coast Guard's Delay in Objecting to Martin's Gas-Free Operation.

Finally, Martin argues that even if the Coast Guard was otherwise acting within its discretionary authority in issuing the order, it had no discretion to wait approximately five months after Martin's first notice of its intention to perform the gas-free operation before objecting "at the eleventh hour." Martin does not cite a single case under the FTCA for this proposition. The only authority Martin cites relevant to the FTCA is 33 U.S.C. § 1224(b),

---

[30] In *Hatahley*, federal agents had seized horses of the Navajo Nation pursuant to a federal and state statute. The agents had failed to comply with the notice provisions of the Federal Range Code, however, so they were clearly acting entirely outside their statutory authority. Accordingly, the Supreme Court determined that there was potential liability under the FTCA.

[31] 28 U.S.C. § 2680(a).

which Martin claims required the Coast Guard to determine whether the operation was permissible "at the earliest possible time."[32]

Section 1224(b) does not require the Coast Guard to make a decision "at the earliest possible time." Rather, it require that the Coast Guard, "at the earliest possible time, consult with and receive and consider the views of representatives of the maritime community, ports and harbor authorities or associations, environmental groups, and other parties who may be affected by the proposed actions."  The record shows that the Coast Guard did request and receive additional information from Martin in early October of 2010, shortly after Martin initially announced its plans, which would satisfy that statutory duty.

At any rate, Martin cannot use § 1224 to establish a duty to either grant or object to its plans within a certain amount of time. Absent a mandatory statutory or regulatory timeline for a decision, we refuse to entangle the courts in the Coast Guard's decisionmaking process by imposing one now. We conclude that the Coast Guard's delay in acting under these circumstances falls within the discretionary function exception.

**D.    Because We Determine that the Discretionary Function Exception Applies, The Private Party Analogue Issue Is Moot.**

Martin argues that if we conclude its claims against the Coast Guard are not barred by the discretionary function exception, we should also address its argument that the Coast Guard would be liable if it were a private person under applicable law (the "private person analogue"

---

[32] Martin cites to a number of common law authorities showing that a private party might have a duty to speak up under these circumstances, but that issue more properly concerns whether there is a private party analogue to the Coast Guard's actions, as addressed in the next section, not whether the Coast Guard's actions concern a discretionary function.

requirement).[33] Because we hold that dismissal is warranted under the discretionary function exception, this issue is moot.

## IV.     The District Court Did Not Err By Permitting the Government to Withhold Certain Documents from Production Pursuant to the Deliberative Process Privilege.

Finally, Martin argues that the district court erred in upholding the Government's deliberative process privilege under 5 U.S.C. § 552(b)(5) over a number of documents, in whole or in part. With respect to the privilege, we review the district court's legal determinations de novo and any findings of fact for clear error.[34] Martin claims it needs these documents because they are relevant to determining whether the Coast Guard adhered to the mandatory statutory requirements, whether the Coast Guard truly acted based on safety concerns, whether Coast Guard officials subjectively believed they were exercising proper statutory or regulatory authority, and whether they acted in an arbitrary and capricious manner in this case.

As explained above, the record already establishes that the Coast Guard satisfied any applicable mandatory requirements, so additional documents are irrelevant to that issue. As a matter of law, Martin's other asserted uses for the documents are irrelevant to analysis of the discretionary function exception. As the Supreme Court explained in *Gaubert*, "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and

---

[33] The FTCA allows suits against the government "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The SIAA similarly provides for liability "[i]n a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained." 46 U.S.C. § 30903(a).

[34] *Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1274 (11th Cir. 2004) (citing *Office of the Capital Collateral Counsel, N. Region of Florida ex rel. Mordenti v. Department of Justice*, 331 F.3d 799, 802 (11th Cir. 2003); *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548, 1554 (11th Cir. 1996)).

on whether they are susceptible to policy analysis."[35] The type of decisions at issue here are unquestionably within the Coast Guard's authority and are susceptible to policy analysis. Because this *type* of decision falls within the discretionary function exception, how the Coast Guard actually arrived at the decision is irrelevant.[36] Thus, although these documents might have been relevant to the merits at later stages of litigation, they are not relevant at this stage. We therefore conclude that the district court did not err by excluding them.

## V. Conclusion

For the reasons set out above, we AFFIRM.

---

[35] *Gaubert*, 499 U.S. at 325. *See also Spotts v. United States*, 613 F.3d 559, 573 (5th Cir. 2010) ("Whatever Maldonado's actual decisionmaking process, it is clear that the health, safety, financial, and other feasibility concerns implicated by the evacuation decision render that decision susceptible to policy analysis."); *Demery v. U.S. Dep't of Interior*, 357 F.3d 830, 833 (8th Cir. 2004) ("The judgment or decision need only be susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account, for the exception to be triggered." (citing *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 801 (8th Cir. 1993)).

[36] *See* 107 Am. Jur. Proof of Facts 3d 241 §§ 23-24 (2009; Supp. Feb. 2015) (collecting cases upholding the discretionary function exception where the government actor acted negligently, abused its discretion, or failed to exercise its discretion).